775 A.2d 193 (2001)
STATE of New Jersey, Plaintiff-Respondent,
v.
Frederick STAMPONE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 30, 2001.
Decided June 21, 2001.
*194 John Vincent Saykanic, Passaic, for appellant.
Pia S. Perez, for respondent (William H. Schmidt, Bergen County Prosecutor, attorney; Susan W. Sciacca, Deputy First Assistant Prosecutor, of counsel and on the brief).
Before Judges PRESSLER, CIANCIA and ALLEY.[1]
The opinion of the court was delivered by CIANCIA, J.A.D.
Defendant Frederick Stampone was found guilty, after a trial de novo in the Law Division, of failing to exhibit a driver's license, N.J.S.A. 39:3-29 and disorderly conduct, N.J.S.A. 2C:33-2a(1). He appeals and we now reverse both convictions.
Except as otherwise noted, the following version of the facts was elicited through the testimony of arresting Officer Joseph Fazio. On September 7, 1999, at approximately 4:50 p.m., Fazio was driving his patrol car on Hillside Avenue in Saddle Brook when he noticed a white Pontiac with Kansas license plates parked on the residential block in front of 222 Hillside Avenue. Defendant was in the driver's seat and the car's ignition was off. When Fazio drove by, defendant did not make eye contact with him and, in fact, looked away from the officer. A week or two earlier a burglary had occurred "down the street." The officer did not know if a car had been involved in the burglary or whether the burglary had occurred during the night or day. Nothing in the record suggests that Fazio had a description of the burglar or that defendant's appearance in any way suggested he was a burglar. Defendant testified he was wearing a shirt and tie.
Fazio decided he would approach defendant, but not before "calling in the stop." Fazio asked defendant what he was doing there and Stampone replied he was waiting for his girlfriend. In response to Fazio's next question, Stampone said his girlfriend lived "right here at 222 Hillside Avenue." The officer asked her name and defendant gave her first name but said he did not know her last name. Fazio then asked defendant his name and defendant said it was Fred. Defendant would not give his last name to the officer. At this point, Fazio went to the residence at 222 Hillside Avenue and determined no one was home. He relayed that information to defendant, who explained that the woman he was waiting for would be home by 5:00 p.m. In fact, shortly thereafter a woman who lived at 222 Hillside Avenue arrived and acknowledged that she and defendant were dating. Prior to her appearance, defendant was twice asked for "identification" and twice said no. Fazio then asked Stampone for his driver's license and defendant said it was in the trunk. By this time it was raining and according to defendant, raining heavily. Fazio asked if defendant could get the license and defendant said no. When asked again, defendant complied. Defendant went to the trunk and retrieved a manila envelope. Defendant went back inside his car with the envelope and closed the door. Fazio saw defendant reach over to the passenger side with his left arm, but could not see what defendant was reaching for. Fazio then opened the driver's door of the car and defendant "reaches back across. Turns backward over here, grabs the door, slams it shut" *195 and "almost slams it" into Fazio's legs. Fazio again opened the door, grabbed defendant by the arm and pulled him "straight forward." The manila envelope dropped onto the passenger seat. Fazio then "stood in the doorway so he wouldn't be able to close it on me again."
Defendant told Fazio to let go of his arm and cursed at Fazio. The officer let go of defendant and again asked for identification. Defendant gave Fazio a Kansas driver's license which Fazio ran a check on. Defendant's license and registration were in order. While this was occurring or perhaps shortly before, a deputy chief had arrived in his own vehicle. He positioned it so as to block defendant's car in case defendant attempted to drive away.
Defendant told the officer his shoulder was injured and he wanted an ambulance. An ambulance was called and arrived on the scene. Before defendant departed for a local hospital, he was arrested and charged with disorderly conduct and failing to produce a driver's license.
Defendant's version of events differed significantly in many respects from Fazio's. The municipal court judge made no explicit findings of credibility. The Law Division judge also made no explicit credibility findings, although he obviously relied upon Fazio's version of events in reaching his decision. In these circumstances we are not obliged to defer to the Law Division's credibility determinations, but we will evaluate the issues based upon Fazio's testimony. On that version of events, the Law Division judge concluded:
I am convinced, beyond a reasonable doubt, that on the date in question, September the 7th, 1999, that Mr. Stampone did cause or did prevent this officer from effectuating what he intended to do, and that was to ascertain his identity through some identification, in the form of a license. And in doing that he did cause public inconvenience, annoyance or alarm and did engage in tumultuous behavior, specifically, by his actions which I read into the record before: Closing the door, preventing the officer from coming in, making movements in the car, that gave the officer the indications that this defendant might be considering itself to cause the officer to take action against this defendant by opening the door and grabbing his arm. All those things were put into place by Mr. Stampone, improperly, and in contravention of 2C:33-2A(1). Perhaps he could have been charged with assault, I don't know, I'm not going to make those findings, but I do believe that he violated 2C:33-2A(1). For those reasons I find him guilty of that. I also find that he failed to exhibit a license or other identification which in fact violates 39:3-29 and I find him guilty of that also....
We disagree. In our view, nothing in this factual complex permitted a conclusion that defendant failed to display his driver's license within the meaning of the motor vehicle statute or that he engaged in disorderly conduct within the meaning of the disorderly conduct statute. This entire incident was an unfortunate example of a police officer overreacting to innocuous conduct and a citizen treating an officer with rudeness approaching insolence that only aggravated the situation. At some point, common sense should have prevailed and the two antagonists gone their separate ways. That did not happen, but we are entirely satisfied that as a matter of law defendant cannot be found guilty of a motor vehicle violation and a petty disorderly persons offense on the facts presented in this record.
Initially, we note that nothing in the evidence would support a claim that Fazio had an articulable suspicion of illegal conduct to support a Terry stop. Terry v. *196 Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968); State v. Maryland, 167 N.J. 471, 488, 771 A.2d 1220 (2001). Evaluation of such a proposition is always fact-sensitive and similar facts, when mixed and matched with other circumstances, will produce varying legal conclusions. Here though, giving every deference to the expertise of Officer Fazio, we can find no basis for the detention of defendant that took place in the course of events leading up to defendant's arrest.
A car parked on a residential street at 5:00 p.m., occupied by a person with no unusual personal characteristics, is not suspicious. Out-of-state plates do not change that. A person's failure to make eye contact with the police does not change that. Most certainly, the fact a crime was committed in the neighborhood a week or two earlier does not change that. If those facts, either separately or collectively, but without more, were sufficient to support a Terry stop, a significant portion of our urban population would be susceptible to constant police investigation. In our view that is an entirely unacceptable proposition.
This is not to say that Officer Fazio was prohibited from approaching defendant and engaging him in voluntary conversation, i.e., a field inquiry. State v. Maryland, supra, at 482-483, 771 A.2d 1220; State v. Sheffield, 62 N.J. 441, 447, 303 A.2d 68, cert. denied, 414 U.S. 876, 94 S.Ct. 83, 38 L. Ed.2d 121 (1973). Concomitantly, however, a person approached by a police officer on that basis need not respond to the police and is always free to leave. Thus, when Fazio made general requests for identification, defendant was at liberty to refuse. Florida v. Royer, 460 U.S. 491, 497-498, 103 S.Ct. 1319, 1324, 75 L. Ed.2d 229, 236 (1983). It is apparent to us, however, and we are sure it was apparent to defendant, that at some point well prior to defendant's arrest, defendant was not free to leave. State v. Maryland, supra, at 482-484, 771 A.2d 1220; State v. Tucker, 136 N.J. 158, 165-166, 642 A.2d 401 (1994). Fazio went from a field inquiry to a Terry stop without the benefit of articulable suspicion. Ibid. Under defendant's version of events, that detention was explicit at the point Fazio went to see if anyone was home at the adjacent residence and instructed defendant not to leave. On Fazio's version it is no later than when he opened the car door and grabbed the defendant. We note this not because the appeal turns on the law of search and seizure, but because the intent of defendant and the interpretation of his actions are essential to a determination of whether he committed a disorderly persons offense and that evaluation must be made in light of the total factual construct.
The summons/complaint against defendant stated that he "purposely cause[d] annoyance or alarm by engaging in tumultuous behavior that prevented a police officer from performing his duties" in violation of N.J.S.A. 2C:33-2a. Defendant was not charged with offensive language under subsection b. In relevant part, the disorderly conduct statute provides:
a. Improper behavior. A person is guilty of a petty disorderly persons offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he
(1) Engages in fighting or threatening, or in violent or tumultuous behavior; or
(2) Creates a hazardous or physically dangerous condition by any act which serves no legitimate purpose of the actor.
[N.J.S.A. 2C:33-2a(1) & (2).]
In a second paragraph following subsection b. dealing with offensive language, is a definition of "public":

*197 `Public' means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood.
[N.J.S.A. 2C:33-2b.]
It is not clear whether the Legislature intended this definition to apply to use of the word "public" in subsection a., but for present purposes we assume a consistency of meaning.
Initially, we note that the portion of the summons charging that defendant prevented a police officer from performing his duties, and the Law Division judge's finding thereof, are irrelevant to a disorderly persons charge pursuant to N.J.S.A. 2C:33-2. Preventing a police officer from performing his duties may, under proper circumstances, constitute obstruction, N.J.S.A. 2C:29-1, or hindering, N.J.S.A. 2C:29-3, or even resisting arrest, N.J.S.A. 2C:29-2, but it is not an element of our disorderly conduct statute. See State v. Doss, 254 N.J.Super. 122, 130-131, 603 A.2d 102 (App.Div.), certif. denied, 130 N.J. 17, 611 A.2d 655 (1992) (interference with another, formerly prohibited by N.J.S.A. 2A:170-29, is now encompassed within N.J.S.A. 2C:29-1 even though historical comments to N.J.S.A. 2C:33-2 indicate a pedigree back to N.J.S.A. 2A:170-29, among other statutes).
Offensive language aside, in order to successfully convict an accused of disorderly conduct the State must prove beyond a reasonable doubt that the defendant caused public inconvenience, public annoyance or public alarm, or a reckless risk thereof, by fighting, threatening, violent or tumultuous conduct, or by creating a hazardous or physically dangerous condition by an act serving no legitimate purpose of the actor. We are unable to find these elements in defendant's conduct. He was not fighting, threatening, nor violent, and the summons did not allege that he was. He was not charged with nor found to have created a hazardous or physically dangerous condition that did not serve his own legitimate purpose. What this case really boils down to is whether slamming a car door closed, and thereby almost hitting a police officer, constitutes tumultuous behavior causing or recklessly risking public inconvenience, public annoyance or public alarm. We have found no case defining "tumultuous behavior," nor any case where conduct as unexceptional as slamming a car door in the presence of a police officer was so characterized. Defendant does not challenge the phrase "tumultuous behavior" as unconstitutionally vague or overly broad, although we are hardpressed to ascertain its definitional parameters. The dictionary definition of tumult speaks in terms of a disorderly and violent movement, agitation or milling about of a crowd, usually with great uproar and confusion of voices, a noisy and turbulent popular uprising, a riot. Webster's Third New International Dictionary 2462 (1993). For present purposes, it is sufficient to find that on the facts here presented there was no tumultuous conduct as a matter of law.
Moreover, in our view, the actions of defendant and his testy exchange with Fazio had no capacity to cause public inconvenience, public annoyance or public alarm. There was no indication that passers-by were noticing any of this or congregating or, indeed, that such persons were even present. Nor was there anything inherent in defendant's conduct as to make it likely that his colloquy with Fazio would cause public inconvenience, annoyance or alarm. And, of course, there was really no evidence that defendant acted with a purpose to cause such public reactions. Not to put too fine a point on it, the conduct *198 most likely to have had such an effect was Fazio's unauthorized entry into defendant's vehicle and the grabbing of defendant. Absent a legitimate fear for his safety or probable cause to arrest, Fazio's intrusion into defendant's vehicle was unwarranted.
Finally, as to the alleged violation of N.J.S.A. 39:3-29, we find that, at most, the facts support a conclusion that defendant once said no to a request for his driver's license and upon a second request immediately complied by going to the trunk and retrieving his documents. That defendant went back inside his car with the manila envelope rather than just handing it to Fazio, is too equivocal to constitute a refusal. The most likely inference is that defendant was getting out of the rain and returned to the protection of his car to open the envelope and obtain the license. Bending over toward the passenger seat is consistent with that as is the envelope dropping onto the passenger seat when Fazio grabbed defendant. In fact, defendant testified, "soon as I got back [into the car] I turned to take the I.D. out of the envelope, and that's when Mr. Fazio grabbed my arm." The papers were ultimately given to Fazio and, except for his precipitous entry into defendant's vehicle, they likely would have been handed over sooner. Our motor vehicle statutes should not be used to punish every citizen who does not instantly comply with an officer's request but does so shortly thereafter. Compare the defendant's contentious and persistent refusal to tender her license and registration in State v. Perlstein, 206 N.J.Super. 246, 250, 502 A.2d 81 (App.Div.1985) (defendant refused, spewed a barrage of comments at the officer and continued to refuse).
What occurred here was unfortunate. An officer who had every right to speak to a citizen chose someone who had a disputatious attitude and was not communicative. Fazio described defendant as very uncooperative and very agitated. He stated that at one point during the exchange defendant was yelling and had an angry tone. We do not condone defendant's conduct, but whatever characterization might be given to it, the point is that he did not act illegally. There was no assault and he was not charged with creating "a hazardous or physically dangerous condition...." N.J.S.A. 2C:33-2a(2). His speech was certainly protected. Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L. Ed. 1131 (1949), reh'g denied, 337 U.S. 934, 69 S.Ct. 1490, 93 L. Ed. 1740 (1949). A fortiori, his attitude, demeanor and tone were not violative of any legal prohibition, whatever opprobrium society may attribute to them. To prosecute defendant on the present facts trivializes our laws. Not every conversational exchange between an overzealous police officer and a contentious citizen should become an occasion for prosecution.
Defendant's convictions are reversed and the charges dismissed.
NOTES
[1] Judge Alley did not participate in oral argument. However, the parties consented to his participation in this decision.