**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2122-16T4
                       A-2436-16T4
                       A-4645-17T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

RICKEY L. BARLEY, a/k/a
RICKEY BARCLAY,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

JUAN K. DUNLAP,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

RICKEY L. BARLEY, a/k/a
RICKEY BARCLAY,

Defendant-Appellant.

Argued March 9, 2020 – Decided April 3, 2020

Before Judges Sabatino, Geiger and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 14-04-0383 and 15-01-0078.

Jack L. Weinberg, Designated Counsel, argued the cause for appellant Rickey L. Barley (Joseph E. Krakora, Public Defender, attorney; Jack L. Weinberg, on the briefs).

Steven William Kirsch, Designated Counsel, argued the cause for appellant Juan K. Dunlap (Joseph E. Krakora, Public Defender, attorney; Steven William Kirsch and Tamar Yael Lerer, Assistant Deputy Public Defender, of counsel and on the briefs).

Patrick F. Galdieri, II, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Christopher L.C. Kuberiet, Acting Middlesex County Prosecutor, attorney; Susan Lynn Berkow, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs in A-2122-16 and A-2436-16; Patrick F. Galdieri, II, of counsel and on the brief in A-4645-17).

PER CURIAM

2

This case arises out of a home invasion in which three masked men forced their way into an apartment, held the occupants at gunpoint, and then fled from the premises without taking anything. Within about two minutes after the incident was reported through 9-1-1, two police officers observed defendants Juan Dunlap and Rickey Barley, along with a third man, sitting in a car parked a block away from the victims' apartment. Believing that the three men were the same ones who had just committed the attempted armed robbery, the officers swiftly apprehended and arrested the men without a warrant.

In the course of their investigation, the police found a black handgun on the passenger side floor of the car, plus other incriminating items inside, including ski masks and a backpack. In addition, a silver handgun fell out of Dunlap's waistband after he was handcuffed. The victims were unable to identify the three arrested men as their perpetrators. No forensic evidence tied them to the crime scene.

Defendants were charged with armed robbery, burglary, conspiracy, and various weapons offenses. They moved before trial to suppress the fruits of the warrantless search and seizure. Following a suppression hearing, the motion judge found the officers' actions constitutional, determining that they had reasonable suspicion to stop the car and probable cause to arrest the men.

A-2122-16T4

After the backseat passenger co-defendant was severed from the case, the case proceeded to a jury trial against Dunlap and Barley. The State's key proofs were the items seized from the car. Defendants were found guilty of all charges. In addition, at a separate later trial, Barley was found guilty of a "certain persons" weapons offense. The court imposed lengthy sentences on both defendants.

In these back-to-back appeals, which we consolidate for purposes of this opinion, defendants principally argue that the trial court incorrectly ruled the warrantless stop and ensuing arrest and search were constitutional. They further contend: the jury should have been charged on identification; the jury should have been instructed on attempted robbery and received a fuller explanation of the elements of theft; the jury should have been charged on vicarious liability; the court should have provided a limiting instruction with respect to the evidence of the silver gun; the court should have granted defendants' motions for acquittal and a new trial; the prosecutor made improper comments in summation; the jury charge and verdict sheet were defective in allowing non-unanimous votes on certain elements; and the consecutive sentences imposed were unjustified and excessive.

For the reasons that follow, we reverse defendants' convictions because the court should have granted their pretrial suppression motion. In particular, we hold the State failed to establish that the officers had probable cause to forcibly remove defendants from their vehicle at gunpoint and immediately handcuff them on the ground without a warrant. Because the evidence seized from the vehicle was tainted by the officers' unconstitutional actions, defendants' convictions based on that evidence must be vacated.

I.

The Home Invasion[1]

On January 4, 2014, a female tenant, her adult daughter, and the daughter's two-year-old son were in the tenant's basement apartment on Louis Street in New Brunswick.[2] Shortly before 7:30 p.m., there was a knock at the door. When the tenant asked twice who was outside but received no answer, she opened the door. Three men, the tallest of whom was carrying a silver handgun, pushed inside.

---

[1] We describe the facts with the benefit of the testimony that emerged at trial. However, in evaluating the search-and-seizure issues, we confine our analysis to the evidence that emerged at the pretrial suppression hearing.

[2] Although the record is not impounded, we discern no reason to mention the victims' names in this opinion, as their identities are not germane to our analysis.

At trial, the tenant and her daughter said that the intruders were all African American men whose masks covered their faces except the skin around their eyes and noses. The man with the gun was about six feet tall, and the tenant said he had a long nose. She said he was wearing a jacket and a black or gray "sweater[] for the cold." The tenant testified that all three men were wearing gray or black clothing and had winter hats on. The daughter said one man was carrying a dark gray or black "book bag" or backpack.

The tallest man pushed the tenant into the kitchen and against the stove, pressing the gun into her face hard enough to leave a mark. He then shoved her into the living room, where the daughter and her son were sitting on the couch. The man pointed the gun at all three victims.

According to the tenant and her daughter, the man with the gun went to stand by the apartment door, the man with the backpack stayed in the living room to watch the victims, and the third man went into a bedroom. The man in the bedroom tilted a chair over and checked around the room, opening drawers and looking through clothes. However, he did not take anything.

The daughter asked what the men were looking for and the man with the backpack told her to shut up. When the daughter pulled out her cell phone and tried to call 9-1-1, he said, "Puta, pass me your cellular phone, you bitch." He

6

did nothing when she refused. The daughter continued to ask what the three intruders wanted, and the gunman became angry.

When the third man came out of the bedroom, all three intruders ran out of the apartment. The daughter immediately called 9-1-1 and described the incident. Police arrived at the apartment within two minutes. According to the daughter, the incident had lasted less than five minutes. The tenant and her daughter found that the perpetrators had taken nothing, despite there being jewelry and money present.

The Police Response and Search and Seizure

At approximately 7:25 p.m. that night, while patrolling the area of Louis Street in their marked car, Officers Jeffrey Monticello and Carlos Adorno of the New Brunswick Police Department received a dispatch reporting the home invasion. The dispatch advised that three men had entered a residence; the tallest of the three had a handgun; one was carrying a book bag; and they had fled toward Somerset Street on Louis Street. The initial dispatch did not state the race of the intruders.

The officers took about one minute to arrive at the intersection of Somerset and Louis Streets. There was snow on the ground. According to the

officers, they didn't see anyone walking around, and vehicle traffic in the area was "light."[3]

Monticello turned off all his car's lights and sirens and drove slowly through the intersection. He briefly looked toward a nearby vehicle with a single occupant. According to Monticello, Adorno then told him, "I got three black males slouching down in a car over here." Adorno indicated a Hyundai parked on the northern side of Somerset Street. This location was within a block of the victims' apartment. The record indicates it was about eighty yards away.

Contrary to Monticello, Adorno testified at the suppression hearing that he did not mention the car occupants' race to Monticello. Later at trial, Monticello amended his testimony from the suppression hearing, and acknowledged that Adorno did not say to him the men were African American.

According to Adorno, as the officers' car passed the Hyundai, he thought the man in the driver's seat tried to hide his face by "sit[ting] all the way back" in his seat. He testified that the driver seemed nervous and avoided eye contact with him. Adorno saw the driver briefly shift the Hyundai into reverse, move "a few inches," and stop again.

---

[3] A police video taken shortly after the defendants were stopped show numerous vehicles parked on the sides of the local streets in the area.

A-2122-16T4

Monticello parked the police vehicle parallel to and slightly ahead of the Hyundai. He went toward the back of the Hyundai while Adorno went to the front. According to the officers, because they were dealing with "a possible threat involving weapons," they drew their weapons while approaching the Hyundai.

Monticello saw three men sitting in the car. According to Monticello, the two men in the front seats, later identified as Dunlap and Barley, appeared nervous and startled by the officers' approach. Meanwhile, the man in the back seat, later identified as Donte Crumidy, was "very nonchalant." Monticello said he found the difference among the three men's reactions to be "an additional key [i]nto what was going on."

The officers ordered the three men to put their hands up. According to Monticello, Crumidy "just kind of complied," but lit a cigarette while doing so. Barley, who appeared surprised, turned toward Monticello and put his hands up as well.

The driver of the Hyundai, Dunlap, did not immediately comply with the order to put his hands up. Instead, Dunlap gripped the steering wheel tightly and shouted, "No, no, no, no!" After repeated orders, Dunlap lifted and lowered his hands in a "raising the roof" motion while continuing to yell. Monticello

testified that Dunlap then raised only his left hand, while moving his right hand toward his waist.

While this was going on, Monticello looked into the Hyundai and saw a black bag on the floor behind the driver's seat. Monticello testified that because the initial dispatch had mentioned a book bag, he felt this "kind of started adding to the totality of the circumstances."

At that point, Monticello saw the emergency lights of other officers arriving at the scene and decided that he and Adorno were no longer outnumbered by the men in the car. Monticello testified that because of Dunlap's noncompliance with the order to raise his hands, he then opened the driver's door of the Hyundai, grabbed Dunlap, and pulled him out. Barley opened the front passenger door and began to get out. Adorno took Barley to the sidewalk to prevent his escape. One of the officers who had just arrived, Gregory Liszczak, pulled Crumidy from the car. All three men were immediately laid face down on the ground and handcuffed.

Adorno used a flashlight to inspect the Hyundai's interior through the front passenger door. He observed a black handgun on the floor of the front passenger side of the car and informed the other officers. Monticello then called for

detectives from the Police Department's major crimes and identification units to document and preserve any evidence inside the car.

According to Monticello, as the officers prepared to remove the three men from the scene, he saw Dunlap try to make a motion toward his waist. Monticello rolled him over onto his back. Adorno then saw a silver handgun fall from Dunlap's waistband. He kicked it away from Dunlap toward other officers standing nearby. Liszczak remarked that the gun "came out of his [Dunlap's] pant[s]," and retrieved it from the ground. Crumidy, who was on the ground next to Dunlap, stated, "That [gun] didn't come out of mine," and "I didn't even know what was going on." Meanwhile, Dunlap screamed and cried. A pat-down search of Barley revealed no weapons or other evidence.

An estimated five minutes and forty-four seconds after Monticello and Adorno received the initial dispatch, and after defendants were removed from the Hyundai, a second dispatch was issued. This dispatch relayed the victim's report that the three home invaders had been wearing masks and dark clothing.

The officers acknowledged that Crumidy was dressed entirely in light-colored outerwear. Dunlap was wearing a gray hooded zip-up sweatshirt, a black long-sleeved thermal shirt, dark colored pants, a navy blue knit hat, a black

11

wave cap, and black shoes.  Barley was wearing jeans, a dark gray zippered shirt, and black shoes.

Events at the Police Station

Following their arrest, Barley, Dunlap, and Crumidy were taken to the police station.  Meanwhile, at about 8:00 p.m., Detective Michael Savoth arrived at the scene of the arrest and took several photographs of the Hyundai's interior through its windows.  Among other things, these photos showed: the black handgun protruding from under the front passenger seat; a hooded black and dark gray fleece sweatshirt on the front floor near the gun; and a black book bag and other clothing items in the backseat area.

Detective Raymond Quick administered Miranda[4] warnings to Dunlap, who said he wanted to speak with Quick.  Dunlap also signed a consent form allowing officers to search the Hyundai, which had by that time been towed to the police station.

The Consensual Search of the Hyundai

The Hyundai was searched with Dunlap present.  Within the car, officers found two black ski masks, a black ski hood, a gray sweatshirt, black gloves, a

---

[4]  Miranda v. Arizona, 384 U.S. 436 (1966).

12

dark brown winter coat, and a black book bag. The items were confiscated as evidence.

Detective Savoth testified that at the time of the search, the black handgun had already been removed from the car. Monticello testified that he wrote in a report that he removed the gun after the car arrived at the police station, "in order to not leave a weapon unsecured." Monticello gave Savoth that black gun and also the silver gun retrieved from the ground near Dunlap.

Additional Facts Adduced at Trial

No usable fingerprints were retrieved from either of the guns found in the car and at the arrest scene. Police found no fingerprints at the victims' apartment. They found no footprints inside or outside the home, and no other forensic evidence. Monticello admitted on cross-examination that there were "a lot of side streets off Louis Street" and that a person fleeing on foot from the victims' home could have gone down any of them or into a nearby home.

Police did not ask the tenant or her daughter to identify defendants as the perpetrators in any show-up, line-up, photographic line-up, or voice-identification proceeding. They were not asked to identify defendants at trial. The daughter said that the backpack found in the Hyundai looked like the one

carried by one of the home intruders, but admitted that she did not know for sure that it was the same bag.

The parties stipulated that neither Barley nor Dunlap had applied for or been issued permits to purchase or carry a handgun or a firearm purchaser identification card.

Suppression Hearing and Ruling

Defendants moved to suppress the items seized by the police without a warrant. The court conducted a two-day suppression hearing, at which Officers Adorno, Monticello and several other officers testified. Upon considering their testimony, the motion judge concluded in a written decision that the police had an "objectively reasonable suspicion to perform a valid investigatory stop and protective search" of defendants and the Hyundai.

Among other things, the motion judge listed the following facts and circumstances, some of which (as we will discuss in Part II, infra) preceded defendants' arrests and others which are post-arrest:

> (1) a dispatch call advised the officers that three males entered a residence, with one at least possessing a weapon, and they fled, (2) less than two minutes after the dispatch call and only a block away from where the victim advised that the suspects had fled, one of the

investigating officers saw three males slouching[5] down in a vehicle in the area towards which the victim advised the suspects had fled, (3) the driver of [the] vehicle attempted to conceal his body and face with the frame of the vehicle and avoided eye contact when approached by the officers, (4) two of the defendants appeared to be nervous and startled and the other acted overly calm and nonchalant, (5) Defendant Barley, without authorization of the officers[,] attempted to open the passenger door, (6) when ordered to put his hands up, defendant Dunlap was non-compliant in that he kept moving his hands up and down and made a deliberate movement towards his waist, (7) Defendant Dunlap made a motion to put the car in reverse, (8) when being handcuffed, a handgun fell from Defendant Dunlap's waistband, (9) and a black and silver handgun was found in plain view in the vehicle.[6]

The judge acknowledged that, under applicable law, defendants' nervousness or furtive gestures, taken alone, [were] not enough to establish a sufficient basis for an investigatory stop." Even so, the judge concluded the record provided "ample" additional facts which, "taken together," formed the basis for "the officers' particularized suspicion."

Among those facts underscored by the judge were the officers' "knowledge and experience," and the "location of defendants in close proximity

---

[5]  As we will discuss, infra, the officers' testimony was that only the driver appeared to be slouching.

[6]  Items (8) and (9) in this listing occurred after defendants were under arrest and thus cannot be relied upon to justify the initial investigatory stop.

to the area where the victim indicated the suspects had fled in less than two minutes after the 9-1-1 call. The judge ruled that "based on the totality of these circumstances," there was "substantial credible evidence" which gave rise to "a reasonable and articulable suspicion that the defendants were engaged in criminal activity, armed and dangerous."

The judge further concluded that "a subsequent search of the defendants' persons was valid." The judge found that the officers' actions were justified "for the protection of the public safety," and "their own safety."

Alternatively, the judge also found the search of the defendants' person "could also be constitutionally sustained as a search incident to a lawful arrest." The judge ruled that "defendants were lawfully arrested due to the totality of the circumstances," and that the officers' search did not exceed the constitutionally permissible area" for a search incident to an arrest. The judge reasoned that once the silver handgun fell from Dunlap's waistband "by his own actions," that particular weapon was "lawfully seized" and it was reasonable for the officers thereafter to pat defendants down to remove any other possible weapons.

Additionally, the judge found that after defendants were handcuffed, the black gun was discovered in the car in plain view. The judge reasoned that defendants "did not have a legitimate expectation of privacy shielding that

16

portion of the interior of the vehicle, which was lawfully viewed from outside" by Adorno.

Finally, the judge found that Dunlap had voluntarily consented to the full search of the car, which yielded the bookbag and clothing. The judge found that a discrepancy between the times stated on the consent form and another police report was "nothing more than a clerical error," based on Quick's testimony that the time shown on the form was the time the search occurred, not the time that Dunlap signed it.

Trial and Verdict

The case against Dunlap and Barley was jointly tried before a jury over several days in May and June of 2016.[7] The jury found defendants guilty of all counts charged.

Specifically, both Barley and Dunlap were convicted of conspiracy, N.J.S.A. 2C:15-1(a)(2) (counts two and three); burglary, N.J.S.A. 2C:18-2 (counts four and five); unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (counts six and seven); and possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (counts nine and ten). Dunlap was convicted of aggravated

---

[7] A different judge presided over the trial.

assault, N.J.S.A. 2C:12-1(b)(4) (count eight). The Court denied both defendants' motions for acquittal and Barley's motion for a new trial.

Sentencing

The court sentenced Barley to an extended term of twenty-five years with an eighty-five percent parole disqualifier for robbery; eight years with an eighty-five percent parole disqualifier for burglary; and five years with a three-and-a-half-year parole disqualifier for each of the two counts of unlawful possession of a weapon. All other counts merged. The burglary and robbery sentences were to run consecutively to one another, and the two weapons possession sentences were to run concurrently to each other but consecutively to the others.

The court sentenced Dunlap to eighteen years with an eighty-five percent parole disqualifier for robbery; nine years with an eighty-five percent parole disqualifier for burglary; five years with a three-and-a-half-year parole disqualifier for unlawful possession of a weapon; and eighteen months for aggravated assault. All other counts merged. As with Barley, the burglary sentence was made consecutive to the robbery. The sentences for the weapons possession and assault convictions were likewise to run concurrent to each other but consecutive to the others.

A-2122-16T4

Barley's "Certain Persons" Conviction

In August 2017, Barley was tried separately before another judge and a new jury on the "certain persons not to have weapons charge." Again, the State's case included the evidence seized after the warrantless police stop and search, including the black gun. The jury found Barley guilty. The court sentenced Barley on this offense to ten years with a five-year period of parole ineligibility, to run consecutively to his sentences from the first trial.

The Present Appeals

Barley appealed his convictions from both the first trial (A-2122-16) and the second trial (A-4645-17). Dunlap appealed his own conviction (A-2436-16). Both defendants include in their respective appeals a challenge to the motion judge's suppression ruling, arguing the police acted unconstitutionally without a warrant. In addition, defendants raise several other arguments, most of which they present in common. Specifically, they raise the following points in their main briefs, which we present in a slightly reorganized and rephrased manner:

Common to A-2122-16, A-2436-16, and A-4645-17

I. WHETHER THE TRIAL COURT ERRED BY DENYING THE MOTION TO SUPPRESS (Barley's point I in both of his appeals, Dunlap's point I).

19

Common to A-2122-16 and A-2436-16

II.     WHETHER THE COURT ERRED BY FAILING
        TO   INSTRUCT   ON   IDENTIFICATION
        (Barley's point II, Dunlap's point III, not raised
        below).

III.    WHETHER THE COURT ERRED BY FAILING
        TO INSTRUCT ON ATTEMPT (Barley's point
        II, Dunlap's point II.A, not raised below).

IV.     WHETHER THE COURT ERRED BY FAILING
        TO INSTRUCT ON VICARIOUS LIABILITY
        (Barley's point IV, Dunlap's point II.B, not raised
        below).

V.      WHETHER   THE   SENTENCES   WERE
        EXCESSIVE (Barley's point VI, Dunlap's point
        IV).

A-2122-16

VI.     WHETHER   THE   COURT   ERRED   BY
        DENYING   BARLEY'S   MOTIONS   FOR
        ACQUITTAL AND A NEW TRIAL (Barley's
        point V).

A-4645-17

VII.    WHETHER   THE   PROSECUTOR
        COMMITTED MISCONDUCT (Barley's point
        II).

VIII.   WHETHER THE COURT ERRED BY NOT
        ISSUING   A   LIMITING   INSTRUCTION
        REGARDING THE GUN RETRIEVED FROM

20

DUNLAP (Barley's point III, not raised below).

IX. WHETHER THE SENTENCE WAS EXCESSIVE (Barley's point IV).

Additionally, after new counsel for Dunlap was substituted for the appellate oral argument because of scheduling issues, Dunlap filed with leave of court a supplemental brief raising one more issue:

THE JURY INSTRUCTIONS AND VERDICT SHEET IMPROPERLY ALLOWED THE JURY TO RETURN NON-UNANIMOUS VERDICTS REGARDING THE IDENTITY OF THE SPECIFIC VICTIM FOR CERTAIN COUNTS AS WELL AS THE IDENTITY OF THE CRIME WHICH WAS THE OBJECT OF THE CONSPIRACY IN COUNT ONE, THEREBY REQUIRING REVERSAL OF THE CONVICTIONS FOR CONSPIRACY, ROBBERY, POINTING A FIREARM, AND POSSESSION FOR AN UNLAWFUL PURPOSE (not raised below).

By letter, counsel for Barley joined in this added point.

II.

We focus our discussion on what turns out to be the pivotal issue in these appeals: the constitutionality of the police officers' warrantless stop, arrest, and seizure of evidence.

In undertaking this review, we must defer to the trial court's factual findings from the suppression hearing, so long as they are supported by sufficient credible evidence in the record. State v. Nelson, 237 N.J. 540, 551

21

(2019). By contrast, the trial court's interpretation of the law and the legal "consequences that flow from the established facts" are reviewed de novo. State v. Gamble, 218 N.J. 412, 425 (2014).

As we have previewed above, there are essentially two critical phases of the search-and-seizure analysis in this case: (1) whether the officers performed a valid warrantless "investigatory stop" of defendants supported by reasonable suspicion; and (2) whether the officers thereafter conducted a valid warrantless arrest of defendants, and an incidental search of their persons and the car, supported by probable cause. These two recognized exceptions to the warrant requirement are delineated by well-established legal principles and fact-sensitive illustrative case law.

## A.

Under the Fourth Amendment of the United States Constitution, a person "may not be detained even momentarily without reasonable, objective grounds for doing so." Florida v. Royer, 460 U.S. 491, 498 (1983). Similar protections apply under the New Jersey Constitution. See State v. Rosario, 229 N.J. 263, 271 (2017).

If an encounter with police does not involve a "detention" or "seizure," an individual's constitutional rights have not been infringed. Royer, 460 U.S. at

22

498.  For example, "mere police questioning" in a public place "does not constitute a seizure" requiring possible suspicion or probable cause under the Fourth Amendment.  Florida v. Bostick, 501 U.S. 429, 434 (1991) (citing Terry v. Ohio, 392 U.S. 1, 19 (1968)).

Some circumstances that may indicate a seizure are "the threatening presence of several officers, the display of a weapon . . . some physical touching of the person . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."  United States v. Mendenhall, 446 U.S. 544, 554 (1980).  New Jersey courts have also held that an objectively reasonable person would not feel free to leave an encounter when a police officer parks a patrol vehicle near his or her car in a manner that prevents the car from exiting.  As the Court discussed in Rosario, 229 N.J. at 273:

> A person sitting in a lawfully parked car outside her home who suddenly finds herself blocked in by a patrol car that shines a flood light into the vehicle, only to have the officer exit his marked car and approach the driver's side of the vehicle, would not reasonably feel free to leave.  That conclusion is consistent with ordinary notions of how a reasonable person responds to a demonstration of police authority.  See Rodriguez, [] 172 N.J. 117, 129 [(2002)] ("[A]s a practical matter, citizens almost never feel free to end an encounter initiated by the police.").  Rather, such police activity reasonably would, and should, prompt a

23

person to think that she must stay put and submit to whatever interaction with the police officer was about to come.

1.

A Seizure Occurred

It is readily apparent in the present case that a "seizure" or "stop" occurred when the officers encountered defendants. They parked their police vehicle in a spot that would impede defendants from driving forward. In addition, there was "the threatening presence of several officers" and "the display of weapons." Mendenhall, 446 U.S. at 554. Officers Monticello and Adorno seized defendants when they drew their weapons, approached the Hyundai, and ordered the three men to put their hands up. Monticello testified that "initially . . . as soon as [the officers] made contact with" defendants, "they were not free to leave" and "were detained."

The State does not contend that the officers approached the Hyundai in a less intrusive manner that would comprise a mere "field inquiry" to ascertain who defendants were and why they were there.[8] In fact, the situation here in

_____

[8] See State v. Pineiro, 181 N.J. 13, 20 (2004) (citing State v. Nishina, 175 N.J. 502, 510 (2003)) (defining a field inquiry as "the least intrusive encounter . . . when a police officer approaches a person and asks if [he or she] is willing to answer some questions).

24

responding to a fresh report of an attempted armed robbery nearby made it too dangerous to undertake such a cordial inquiry. The State maintains, and we agree, that it was sensible under the circumstances for the officers to approach the Hyundai with their guns drawn for their safety.

Given that a seizure or investigatory stop was occurring when the officers first approached the car, the critical analytic question then becomes whether that warrantless police action was supported by reasonable suspicion.

The Reasonable Suspicion Requirement

The United States Supreme Court has held that "certain seizures are justifiable . . . if there is articulable suspicion that a person has committed or is about to commit a crime." Royer, 460 U.S. at 498. New Jersey courts have clarified that an "investigatory detention" is "permissible 'if it is based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity.'" State v. Chisum, 236 N.J. 530, 545-46 (2019) (quoting Pineiro, 181 N.J. at 20). Such a stop "may not be based on arbitrary police practices, the officer's subjective good faith, or a mere hunch." State v. Coles, 218 N.J. 322, 343 (2014). If there was no reasonable suspicion, evidence discovered during a search conducted during the detention must be excluded. Chisum, 236 N.J. at 546. The State

bears the burden to prove that a warrantless stop was valid. State v. Atwood, 232 N.J. 433, 444 (2018).

To determine whether reasonable suspicion existed, a court must consider the totality of the circumstances, viewing the "whole picture" rather than taking each fact in isolation. Nelson, 237 N.J. at 554-55. This analysis may also consider police officers' "background and training," including their ability to "make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." Id. at 555 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)). Additionally, "police may rely on behavior that is consistent with innocence as well as guilt in finding reasonable and articulable suspicion to conduct an investigatory stop." Pineiro, 181 N.J. at 25.

Generic Descriptions on Police Dispatches

As we have noted, the stop in this case was prompted by a police dispatch. The dispatch merely identified the intruders as three males, one of whom was taller than the others, wearing masks and dark clothing. Our courts have held that an individual's similarity to a very general description given in a dispatch or warrant does not by itself justify an investigative detention, because it does not give rise to a sufficiently particularized suspicion that the person is or has

engaged in criminal activity.  See State v. Shaw, 213 N.J. 398, 401-11 (2012) (affirming reversal of trial court's denial of motion to suppress evidence seized during stop, where defendant's only similarity to fugitive police sought was that he was "a black male"); State v. Caldwell, 158 N.J. 452 (1999) (reversing denial of suppression where only information officer had was that suspect was a black male at a certain address).

In a case having some similarity to the present case, State v. Stampone, 341 N.J. Super. 247, 249-52 (App. Div. 2001), an officer looking for a burglar had no description of the perpetrator, but approached the defendant as he sat in his parked car near the crime scene, demanded to see identification, argued with him when he refused to comply, then arrested him.  We stated that "[a] car parked on a residential street at 5:00 p.m., occupied by a person with no unusual personal characteristics, is not suspicious." Id. at 252.

Furtive Movement and Nervousness

The officers' suppression hearing testimony in the present case highlighted allegedly furtive movements by the Hyundai driver and perceived nervousness of the driver and the front-seat passenger.  As the motion judge properly noted, such observations cannot be dispositive or given undue weight. "'Furtive movements by [a] defendant," by themselves, "cannot provide

27

reasonable and articulable suspicion to support a detention in the first instance." Rosario, 229 N.J. at 277; State v. Dunbar, 434 N.J. Super. 522, 527 (App. Div. 2014). "Nervousness and excited movements are common responses to unanticipated encounters with police officers on the road, and '[m]ere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity." Rosario, 229 N.J. at 277 (quoting State v. Lund, 119 N.J. 35, 47 (1990)).

An individual's "failure to make eye contact with the police" also does not transform otherwise innocuous actions, such as sitting in a parked car, into suspicious ones. Stampone, 341 N.J. Super. at 252. See also Rosario, 229 N.J. at 267-77 (holding an officer's detention of the defendant unjustified where she had been sitting in her parked car, glanced nervously at him as he approached, and "scuffled around" with something in the passenger seat).

In State v. Tucker, 136 N.J. 158, 169-70 (1994), the Court found that even a person's flight upon seeing police does not by itself generate reasonable suspicion, absent other evidence of criminal activity such as possession of suspicious package, the furtive exchange of money, a report of nearby crimes, or a description of a crime suspect matched by the fleeing individual.

By contrast, the Supreme Court found an investigatory detention proper where a defendant met a more detailed description and also appeared nervous as police approached. State v. Privott, 203 N.J. 16, 28-29 (2010). In Privott, the Court found that an anonymous tip that a tall, thin, dark-skinned male wearing a black jacket and a black and red cap was standing on a certain corner and had a handgun would have been insufficient on its own to generate a particularized suspicion that the defendant, who matched most of that description, was engaged in criminal activity. However, because the defendant was known to the investigating officer from prior arrests, "appeared nervous," and walked away from the officer while putting a hand near his waistband, an investigatory stop was proper. Ibid.[9]

### Proximity of Place and Time

Our case law has also recognized that "the proximity of the stop in time and place to the crime in question" can be "critical to the resolution of the existence of a reasonable and articulable suspicion." State v. Gavazzi, 332 N.J. Super. 348, 357 (App. Div. 2000). In State v. Reynolds, 124 N.J. 559, 569

---

[9] See also State v. Ruiz, 286 N.J. Super. 155, 163 (App. Div. 1995) (in which suppression was properly denied where the defendant was known to officer from prior arrests, was walking in the center of the road late at night in an area known for drug trafficking, had been reported in an anonymous tip, and immediately ran away upon seeing officer).

(1991), the Court found that the facts that the defendant matched a description by the assault victim and was located by an officer in a field near the crime scene shortly thereafter were sufficient to generate a reasonable suspicion. Similarly, in State v. Todd, 355 N.J. Super. 132, 138 (App. Div. 2002), the defendant matched the height, weight, and clothing of a description given of a cat burglar; was spotted in the vicinity of the burglaries minutes after they were reported; was the only person walking on that street at 3:30 a.m.; and was "sweating and appeared nervous." We held in Todd that police had the necessary level of suspicion to conduct an investigative stop to question the defendant. Ibid.[10]

2.

Analysis

Applying these principles, we recognize that both sides present strong

---

[10] See also Gavazzi, 332 N.J. Super. at 360-62 (investigatory stop of defendant's car proper where the defendant matched height and clothes of robber, officers saw car traveling away from scene six minutes after crime, and car was only vehicle on rural road); State v. Wanczyk, 201 N.J. Super. 258, 261-64 (App. Div. 1985) (stop of vehicle proper where the defendant was seen leaving area of arson at nature reserve and getting into that car); State v. Anderson, 198 N.J. Super. 340, 347 (App. Div. 1985) (stop of vehicle in which two black males were visible found proper where car was only vehicle on road at 1:30 a.m. in area of robbery shortly after crime reported and dispatch reported three armed black males).

30

reasons for concluding that reasonable suspicion was or was not present here to justify an investigatory stop.

On the State's side of the ledger, the strongest point is proximity to the time and place of the reported crime. Temporally, the police encountered defendants' vehicle only about two minutes after the 9-1-1 caller reported the intrusion. In fact, the 9-1-1 caller was still on the phone with the dispatcher when defendants were apprehended, and the dispatcher asked her if she could identify them if they were brought to her. The physical proximity of the police encounter was also very close: less than a block away and under the length of a football field. In addition, the State emphasizes the numerical match of three intruders and three men in the Hyundai. Further, the State has in its favor the observed slouch of Dunlap as the police approached, the perceived nervousness of both defendants, the brief attempt to put the car in reverse, and the observation of a backpack in the car.

Defendants, meanwhile, have several important factors in their own favor. The dispatch description of the intruders was highly generic; we can take judicial notice that it is not uncommon to come upon a trio of adult males in New Brunswick in a parked car possibly wearing dark clothing. The match of three men is not especially significant since, as defendants argue, the three

31

perpetrators left the apartment on foot and could have dispersed individually, or with one peeling off from the other two. Or one or more other people, such a separate getaway driver, could have joined the group.

This case is factually different from some others where proximity to a crime scene was held to justify an investigative detention. In Reynolds, 124 N.J. at 569, Todd, 355 N.J. Super. at 138, Gavazzi, 332 N.J. Super. at 360-62, and Anderson, 198 N.J. Super. at 347, the descriptions of the perpetrators that the defendants matched were more detailed than simply "males," as here. In those cases, and Wanczyk, 201 N.J. Super. at 261-64, the defendants were the only people seen walking or driving in the area near the crime scene, while here, there was "light" vehicle traffic nearby. Reynolds, Gavazzi, and Wanczyk involved rural or park land areas where the defendants' presence was notable in itself, while here, the crime and arrest took place in an urban area where Monticello admitted there were "a lot of side streets" and homes where the perpetrators could have fled.

This case also has some differences from other cases where nervous behavior upon noticing a police presence was held to support reasonable suspicion. In Privott, 203 N.J. at 28-29, the defendant matched a much more detailed description, including height, weight, and clothing, and his nervous

behavior including reaching for his waistband while walking away from the investigating officer.  In <u>Ruiz</u>, 286 N.J. Super. at 163, the defendant was not only nervous, he ran away, and his behavior in walking in the middle of a road very late at night was unusual.  Here, the scenario was more similar to <u>Rosario</u>, 229 N.J. at 267-77, and <u>Stampone</u>, 341 N.J. Super. at 252, where the facts that the defendants were sitting in parked cars and avoided eye contact with officers or made "furtive" movements were deemed insufficient to justify a search.  On the other hand, unlike the latter two cases, here there was a report of a robbery occurring shortly before the officers approached defendants.

Considering the "totality of circumstances," we discern strong factual points both in favor and against a finding of objectively reasonable suspicion to justify an investigatory stop of defendants.  We need not resolve this very close question because, as we will now explain, we conclude the officers lacked probable cause to arrest defendants at the critical point in time when they did so.

## B.

As a threshold aspect of the arrest analysis, we reject the State's contention that defendants were not yet arrested until after Dunlap, already handcuffed on

the ground, rolled over and the silver gun was exposed. The arrest occurred before that point in the sequence of events.

The touchstone of an arrest is whether a reasonable person in the situation would feel free to end the encounter with police. State v. Shaw, 213 N.J. 398, 410 (2012). If police officers' conduct is more than what is "minimally intrusive" than required to investigate, it can be regarded as an arrest. State v. Dickey, 152 N.J. 468, 478 (1998).

One indication that an arrest has occurred is when law enforcement has placed an individual in handcuffs. Id. at 479. See also State v. Shaw, 237 N.J. 588, 613 (2019). Here, the police almost immediately placed defendants in handcuffs once they had forcibly pulled them out of the car. Defendants were then forced to lie face-down, on the cold ground in handcuffs, on separate sides of the car, with police officers hovering over them. It is incredible to say that defendants by that point were still free to leave. Their freedom of movement was clearly and forcibly restricted. That restraint went well beyond the level reasonably necessary to conduct a mere investigatory stop.

The level of police restraint quickly escalated here to the degree of an arrest. The circumstances have some parallels to those in DelaCruz v. Borough of Hillsdale, 365 N.J. Super. 127, 146 (App. Div. 2004), aff'd in part, rev'd in

part, 183 N.J. 149 (2005), in which an investigatory stop escalated into a "de facto arrest" carried out in a "confrontational manner." The two police officers in DelaCruz were convinced they had come upon a wanted burglar, removed a perceived suspect from a vehicle at gunpoint, physically forced him facedown to the ground, and kept him handcuffed for over ten minutes. Ibid. We held this rough manner of interacting with the individual was "factually unwarranted and legally untenable, under the circumstances." Ibid.

In making these observations, we do not suggest that police officers cannot use reasonable force to restrain an arrestee. Of course they can. Our point is that when the use of physical restraint intensifies to the degree shown here, there can be little doubt that the individual has been arrested, whether or not a formal proclamation of an arrest has yet been made.

The key question then becomes whether the police had sufficient probable cause to arrest defendants at the point in time when they were pulled out of the car, handcuffed, and forced to lie face down on the ground. We conclude that such probable cause was not yet present, and the motion judge erred in finding otherwise.

At the time defendants were arrested, neither the black gun nor the silver gun had been observed. No witness had seen them get into the car after the

35

home invasion. As we have noted, the victim's description of "three males in dark clothing" was quite generic. Likewise, backpacks are a common item. The Hyundai, although pointed in a direction away from the victim's apartment with the engine running, was lawfully parked at the side of the road. Unlike in Coles, 218 N.J. at 329, defendants had not given suspicious answers to police questions. They apparently weren't asked any questions before they were removed from the car and handcuffed.

We acknowledge that Dunlap did not immediately comply with the officers' command to raise both of his arms, and that he was seen reaching in a direction towards his waistband. We also acknowledge Officer Monticello saw a black backpack as he approached the vehicle. We are aware that the two officers were initially outnumbered three-to-two, although backup officers had arrived by the time defendants were pulled out of the car and placed in handcuffs. These are points helpful to the State's position. Nevertheless, on balance, we are not persuaded that the information known to the officers—even if it hypothetically satisfied the lesser standard of reasonable suspicion—met the more rigorous standard of probable cause. There was not yet in the chronology a sufficiently "well-grounded" basis to believe that defendants had committed a crime. Pineiro, 181 N.J. at 21.

To be sure, we appreciate the public safety aspects of these issues, and the practical challenges of police officers making on-the-spot assessments of unfolding and potentially dangerous situations when out on patrol. We have already stated, as defendants concede, that it was appropriate for the officers to approach the car with their guns drawn. But the officers went over the line beyond constitutional safeguards by escalating the situation to an arrest, without knowing more inculpatory facts or observing more troubling behavior. If we were to condone the escalation that occurred here, that conceivably would invite law enforcement to "rush to judgment" too swiftly in situations involving other civilians who happen to be sitting in a parked car near the recent scene of a crime.

C.

In sum, we are constrained to conclude that the warrantless arrest of defendants in this case was unconstitutional. Because of that, the fruits of the searches that ensued must be suppressed. State v. Herrerra, 211 N.J. 308, 330 (2012). Consequently, defendants' convictions based upon the illegally-seized evidence must be reversed, and their cases remanded for further proceedings.

## III.

We briefly address defendants' remaining arguments for sake of completeness. Only two of their arguments have enough merit to warrant discussion: (1) the absence of a jury charge on identification; and (2) the imposition of multiple "stacked" consecutive sentences upon each defendant.

First, we are persuaded that the trial court -- although it was not requested by defendants' trial counsel to do so -- should have issued the relevant portion of the model jury instruction on identification. See Model Jury Charge (Criminal), "Identification: No In-Or-Out-Of-Court Identification" (approved Oct. 2015). This special instruction, crafted after our Supreme Court's seminal opinion on identification issues in State v. Henderson, 208 N.J. 208 (2011), appropriately advises jurors in circumstantial evidence cases such as this one that the identity of a criminal offender is a necessary element that the prosecution must prove beyond a reasonable doubt. See also State v. Cotto, 182 N.J. 316, 326 (2005). The utility of this instruction is not eliminated by the absence of any positive identifications by the apartment-dwelling victims. In fact, the absence of an eyewitness identification is the very reason this jury instruction exists.

That said, we are not persuaded the omission of the instruction is plain error that compels reversal in and of itself. R. 2:10-2. The jury was more generally advised of the State's burden to prove all elements of the charged offenses beyond a reasonable doubt. To be sure, it would have been preferable for the identification charge to be given, but the error was not "plain."

Second, the trial court at sentencing did not adequately explain why the consecutive sentences for the burglary, robbery, and weapons offenses were justified, beyond the general principle that offenders should have "no free crimes." State v. Yarbough, 100 N.J. 627, 643 (1985). The trial court did not provide a sufficient analysis of the Yarbough factors to support the consecutive sentences. The State does not provide a convincing justification for the omission. Had we not set aside defendants' convictions, we would have remanded for resentencing to cure this omission.

All other arguments raised by defendants lack sufficient merit to warrant discussion. R. 2:11-3(e)(2). In particular, we discern no other shortcomings in the jury charge. Although the verdict sheet could have been improved to guard against non-unanimity, we do not regard it as critically defective. We are unpersuaded that any other errors occurred during the trial that were clearly

A-2122-16T4

capable of producing an unjust result, or that the jury's guilty verdict lacked sufficient support in the evidence the trial court admitted.

Reversed and remanded for proceedings consistent with this opinion. We do not comment on whether the State might possess any non-suppressed evidence that could support a second trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2122-16T4