NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4752-17

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DWAYNE D. BOSTON,
a/k/a TIMOTHY MCCANN,
DWAYNE R. BOSTON,
RALPH R. BOSTON, and
DWAYNE MCCANN,

     Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

September 16, 2021

APPELLATE DIVISION

Argued November 5, 2020 - Decided September 16, 2021

Before Judges Ostrer, Accurso, and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 15-09-2753.

Alison Perrone, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Brian P. Keenan, Assistant Deputy Public Defender, of counsel and on the briefs).

Rachel M. Lamb, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Jill S. Mayer, Acting Camden County Prosecutor, attorney; Jason Magid, Special Deputy

Attorney General/Acting Assistant Prosecutor, and Rachel M. Lamb, of counsel and on the brief).

The opinion of the court was delivered by

ACCURSO, J.A.D.

Defendant Dwayne D. Boston was arrested for third-degree possession of cocaine following a routine traffic stop on his way home from the movies with his wife and children. His suppression motion was denied, the jury convicted him, and the judge sentenced him to a discretionary extended prison term of seven years with three-and-a-half years of parole ineligibility. He appeals, contending the police unlawfully asked him, a front-seat passenger in his wife's car, to hand over his State identification card after he told them he did not have a driver's license. We agree, and reverse. We hold the officers' demand for Boston's identification after he told them he did not possess a driver's license, exceeded the scope of this routine traffic stop. Accordingly, we find defendant's arrest on the subsequently discovered open traffic warrant was unlawful, and the drugs seized in the ensuing search incident to that arrest should have been excluded at trial.

This case is unusual in that the evidence at trial differed from what the State presented at the suppression hearing because the officers' dash cam videos were not played at the suppression hearing. We present the evidence as it was offered, first at the suppression hearing and then at trial.

2

Boston was arrested on a rainy Saturday night in March 2015, when a Cherry Hill police officer ran a random lookup of his wife's license plate and learned the registered owner of the car had a suspended license and an active traffic warrant. Boston moved to suppress the drugs recovered in the search incident to his arrest, claiming the officer didn't "take the time" to observe whether the driver matched the description the officer obtained in his lookup; that as an "innocent passenger," he shouldn't have been subject to questioning or having his name checked in the National Crime Information Center (NCIC) database; and that a police officer choosing "which plates to run . . . based on the race of the driver," violates the Constitution.

The State opposed the motion, arguing the information that the registered owner's license was suspended and she had an active traffic warrant were sufficient justification for the stop in accord with State v. Donis, 157 N.J. 44, 54-55 (1998), and the officer didn't need to match the physical description of the registered owner to the driver before signaling for the driver to pull over. The State claimed defendant had "absolutely nothing" to suggest the officer's random plate inquiry was racially motivated, thus requiring no response on its part. Finally, the State contended the facts demonstrated the officer only asked for defendant's identification after his wife's arrest "in order to confirm that he had a valid driver's license and could take possession" of the

3

car, and the officer didn't need reasonable suspicion to run defendant's name through the NCIC database under State v. Sloane, 193 N.J. 423, 426 (2008).

At the suppression hearing, the testimony went in as the State represented in its brief it would. The officer who made the stop testified he was stopped at a red light while traveling east on Route 38 at about 8:35 p.m. According to the officer, he "typically conduct[s] random inquiries of the registrations of the vehicles around [him]. And that's what [he] did." When he ran the plate on the gold Hyundai stopped in front of him at the same light, he saw the registered owner had a suspended driver's license, as well as an active ATS (automated traffic system) warrant. The officer activated his overhead emergency lights, pulled the Hyundai over, and advised dispatch he was conducting a stop. He also radioed for backup. He then walked to the driver's side door and spoke to the driver, noting there was a male passenger, defendant, in the front seat and three children in the backseat. The officer testified he collected the driver's documents and returned to his patrol car.

Asked what happened after that, the officer testified he confirmed the driver was the registered owner and had an active traffic warrant. The officer testified his "partner" had by then arrived and the two reapproached the car. The testifying officer explained he had the driver get out of the car and arrested her on the open warrant. According to the officer, he then had his

partner "obtain identification on the male passenger so that we could turn over custody of the vehicle to him, since there were children in the vehicle." He explained he "didn't want to have to tow the vehicle and leave them stranded."

The officer testified that when his partner checked defendant's information, he learned defendant also had a suspended New Jersey license and an active traffic warrant. Knowing that both adults would be arrested, the officer reapproached the car and advised defendant "to make arrangements" for the children, which defendant did by calling his sister, who lived in Camden, to come pick them up. When defendant's sister arrived, the officer completed a juvenile release form allowing her to take the children and handcuffed defendant. The officer testified that although defendant was under arrest, the officer waited to handcuff him until his sister arrived so he wouldn't have to arrest defendant "in front of his children." Before placing defendant in the back of his patrol car, the officer conducted a pat down search and found the crack cocaine in defendant's jacket pocket. Defendant's sister followed the officers to the nearby police station in the Hyundai where defendant and his wife were processed and released.

After the officer completed that narrative on direct examination, the prosecutor prepared to show the dash cam videos of the stop. Defense counsel announced she would "stipulate . . . that [the video] pretty much shows what

the officer testified to. There's really no discrepancy." Because counsel stated she had "no cross-exam based on the video," it was not played for the court. The judge secured the agreement of both counsel that she could watch it later, "[i]f necessary," and defense counsel proceeded without the videos for her cross-examination of the officer.[1]

On cross, defense counsel asked the officer whether "[a]t any point before asking [defendant] for his information, did you ask him if he wanted to drive the car." The officer responded that he "didn't speak with [defendant] at that point," instead asking his partner to ask defendant "if he wanted to take possession of the vehicle." The officer couldn't say whether his partner asked the question before directing defendant to produce his identification. The officer agreed with counsel that defendant was cooperative and polite throughout their encounter and had done nothing to arouse any suspicion of wrongdoing.

---

[1] We do not approve of this practice, which appears to us a too casual approach to the handling of evidence on a suppression motion. Not admitting the videos in evidence while still making them available to the court for review "if necessary," leaves the record open and unsettled, inappropriately so. See R. 1:2-3 (stating "[t]he verbatim record of the proceedings shall include references to all exhibits").

A-4752-17

On re-direct, the prosecutor asked if the officer's usual practice when he arrests a driver with another person in the car was to "check to see if the other person's able to even drive a car." The officer responded:

> Yes. And most of the time I'll ask. I don't recall if I asked [defendant's wife]. But I was acting in good faith as far as the welfare of the children. I obviously didn't want to — I mean, at that point, the registered owner was placed under arrest, and it's her vehicle. I could have towed the vehicle and left Mr. Boston and the three children there, and I didn't want to do that. So that's why I, you know, requested — I wanted to check the validity of his license.

The prosecutor followed up, "[s]o you usually let someone else take over another car, especially with passengers. Would you run — do you run their stuff?" The officer answered he did, "[j]ust to check to make sure they have a valid license."

On re-cross-examination, defendant's counsel said she had only "one question," asking: "You said you checked the validity of his license. Did — because you didn't speak to [defendant], would it be fair to say you don't know whether or not he said 'I have a license, I'm going to drive the car?'" The officer replied: "No, I do not. And I don't recall if I had the physical license, or if he provided his information."

That question prompted one from the court. The judge probed to confirm with the officer that he "had no conversation with [defendant] as to

whether or not he was driving, going to be taking the kids home, before we got to that point [the driver's arrest], or you got to that point? It was all [the officer's partner]?" The officer replied:

> Yes, I believe so. Because I was in my vehicle with [defendant's wife], and I don't recall, but typically I ask the owner if they want — I usually give the option. I'll ask, you know, I can tow your vehicle or you can give it to somebody else. And in this case, another adult was present. So I don't recall specifically, but what I — how I typically operate, I would ask her if she wants me to have [defendant] take possession of the vehicle for her. . . . As opposed to towing it.

After hearing that testimony, the judge denied defendant's suppression motion without viewing the video. She noted defense counsel's significant concession, following the officer's testimony, that he was credible, and race didn't play any role in the stop. The judge agreed, saying she couldn't "find one thing that's not believable about this, about his testimony." She found that after confirming defendant's wife was the registered owner of the car and had to be arrested, the officer did what she hoped "any decent police officer would do," and that is not arrest defendant in front of his children and "made sure the kids had a safe place to go as opposed to hurting the kids and sending them to [the Division of Child Protection and Permanency] or [to] some type of custodial situation."

8

The judge found it "reasonable to ask the other adult in the situation if they are going to be driving, and for their identification." She rejected defendant's claim that he, as the innocent passenger, was illegally searched "because the officer ran his information through the database without reasonable suspicion or probable cause to do so," explaining to defendant, who was present in the courtroom, that the officer "doesn't necessarily need that." Relying on <u>Sloane</u>, the judge explained to defendant that "running [his] driver's license through the database is not a search, but rather a reasonable inquiry to ensure that [he] could lawfully take possession of the vehicle."

At trial, however, the evidence was different from what it had been at the suppression hearing. The prosecutor opened to the jury plying the same theme, telling jurors they would hear from the officer, who would explain he "generally permits the passenger or someone eligible to drive the car or to go ahead and take the car off, usually after confirming their identity," but could not do so here because the lookup revealed an open traffic warrant for defendant as well. Defense counsel, on the other hand, told jurors they would get to see the dash cam videos and hear the officer ask defendant "do you have a license? Can you take control of the car?" and hear defendant "say, no I only have this State I.D. I don't have a license."

When the officer testified at trial about the stop, the prosecutor asked, "in this kind of situation where you have three children in the backseat and another person who could potentially drive, what do you do, generally?" The officer answered he "usually ask[ed] if [the passenger] ha[s] a valid driver's license and confirm that, and if it's okay with the registered owner, then [he'll] release the vehicle to them as opposed to towing it." When the prosecutor asked how the officer confirmed defendant had a valid driver's license here, the officer responded:

> I had my partner ask him for — I believe I initially asked if he had a valid license, and he didn't give me a straight answer and I wasn't really sure but he indicated that he didn't. I had my partner . . . ask him for his information so we could look up his license to confirm its status.

In response to the prosecutor's question of whether defendant produced a license, the officer testified, "I don't believe he had a license on his person or an I.D. but he provided his personal information so we could look it up."

The prosecutor next asked "if you ask him, does he have to provide you that information?" The officer responded "[i]n this case, no, he wasn't violating any laws or anything like that so he did not." The prosecutor followed up: "But in this case he did provide it." To which the officer responded, "Yes." The officer further testified that defendant provided his name and date of birth, explaining "[t]hat's all we need to look up a driver's

10

license or a State I.D."  In response to the prosecutor's question of why the officer would want the passenger's personal information, the officer responded:

> In this particular case, one, to confirm his license status even though he indicated that it wasn't valid. We have people who are unsure of the status of their license all the time.  They'll tell us it's suspended when it's not or vice versa.  So to confirm its status, to make sure that it wasn't actually valid so we could turn the vehicle over to him, and also due to the fact that there was three children in the back, for documentation purposes since we're placing the driver under arrest we don't want to leave children with an unidentified person in the vehicle.

The officer testified that when his partner "check[ed] [defendant's] information," he learned defendant also had a suspended license and an open traffic warrant, meaning defendant would also have to be arrested.[2]  The officer testified that

> [d]ue to the circumstances, it was raining, it was dark outside, the three children in the vehicle, [he] didn't want to place [defendant] under arrest and leave the children in the vehicle by themselves.  So we approached [defendant] and advised him . . . of the circumstances and had him contact a family member

_____

[2]  Although there is no question but that the inquiry resulted in an audio notification to the officers that defendant's license was "suspended," the discussion between defendant and the officer captured by the video suggests the "suspension" might have resulted from defendant being recently cited for driving without a license.  Our review of the record suggests no definitive answer as to whether Boston did or did not have a New Jersey driver's license.  The motor vehicle record is not in the appendix.  Because it is not relevant to our analysis, we do not consider the issue further.

to respond to take custody of the children and the vehicle.

After having the officer testify to placing defendant under arrest and finding the cocaine in the pocket of his jacket, the prosecutor played the officers' dash cam videos for the jury.[3] Critical to our analysis, the first minutes of the video show the officer walking to the driver's door, introducing himself and asking for the driver's license, registration and insurance card. The driver turns over some documents, and the officer confirms with her that she is the registered owner. He then explains the reason for the stop.

The officer next asks if the front seat passenger is the driver's "husband or boyfriend." The driver's answer is inaudible, but the officer immediately

---

[3] As already noted, the dash cam videos were not played at the suppression hearing, and the judge was apparently viewing them for the first time at trial. At trial, only the first thirty-two-and-a-half minutes of the arresting officer's dash cam video of the stop was played for the jury. The only portion of the backup officer's dash cam video played at trial was the five-minute segment recording defendant's arrest and subsequent search. The parties agreed the jury would only be shown those portions of the videos, and the start and stop times of each were a part of the stipulations included in the jury instructions, according to the judge. In their briefs, both parties make reference to aspects of the backup officer's dash cam video that were not played at trial and thus never viewed by the jury. The State also makes reference to the dash cam videos when discussing the evidence presented at the suppression hearing, ignoring it elected not to play the videos at that hearing. Although disk(s) containing the entirety of both dash cam videos were entered in evidence at trial and are included in defendant's appendix, we do not consider those parts not played for the jury as part of the trial record. We thus have limited our own discussion of the dash cam videos to those portions actually viewed by the jury.

asks defendant, "do you have a valid license on you, sir?" Defendant's answer is also inaudible, but the officer responds, "I mean do you have one, you just don't have it with you?" Again, defendant's answer is inaudible beyond the word, "photo." The officer tells the driver, "I can't hear what he's saying." The driver's response is also inaudible, but it prompts the officer to say, "I know. I'm not asking if he has one on him. I'm asking if he has one." In a clear exchange, defendant says, "No, I have no license. I've got a photo I.D." The officer replies, "Oh, a State I.D.?" Defendant answers, "Yeah," prompting the officer to say, "Okay, let me see that." The driver shortly hands something to the officer, which he appears to review.

After obtaining yet another document from the driver and telling her to "hang tight," the officer walks back to his patrol car. A minute or so later, the officer returns to the car, asks the driver to step out and arrests her on the traffic warrant. By then, the officer's backup had arrived. As the arresting officer puts defendant's wife in the backseat of the patrol car, he tells his partner to "see if he has I.D.," notwithstanding the arresting officer appeared to already have reviewed the identification defendant appeared to have produced at the officer's request.

While the video picks up the conversation between the arresting officer and the driver as he secures her in the backseat of his patrol car, the backup

13

officer is visible at defendant's door. The arresting officer is then shown joining his backup partner at defendant's door to explain why they've arrested his wife. The backup officer remains for a minute or so, and then walks back toward the patrol cars. The arresting officer asks whether defendant "has any money on him" to satisfy the ticket underlying his wife's arrest warrant. When defendant says he has $200, the officer offers to take it to defendant's wife, telling defendant the sum should be sufficient to allow his wife's immediate release. Addressing defendant's lack of a driver's license and the kids in the backseat, the officer tells defendant:

> look, you're on a private, municipal road, you're not in the middle of the road or anything like that, okay.[4] Obviously, if you don't have a license, I'm not going to tell you you are allowed to drive or whatever. But you have a cell phone on you, right? You can start to make arrangements, okay. I trust you, you are an adult. I'm not gonna you know . . . But as far as you being able to drive, you're not going to be able to drive, you're going to have to figure something out. I mean, she shouldn't have even been driving here . . . her license was suspended, okay. So look, look at me, I understand the situation. I want you to use your judgment, okay, but we can't tell you you are allowed to drive or anything because you don't have a license, okay. Do you have anybody that can come?

---

4 When police signaled her to pull over, the driver had turned off Route 38 onto a residential street.

By the time the arresting officer had completed his conversation with defendant and was taking the cash to his wife, the officer's partner had learned, based on the information provided by defendant, that defendant also had a suspended license and an active traffic warrant.  As the two officers confer briefly behind the car, one of the officers comments, "This is a mess," to which the other responds, "Yep."  The arresting officer asks, "What are we going to do with the kids?"  His backup replies, "I don't know, man.  They are going to have to call to get someone here.  See if they can call somebody to come pick up the car, like a grandma, aunt, sister, brother."  By that time, however, the video makes clear defendant was already making "arrangements" based on the arresting officer's prior direction to have someone come and drive the car to the police station where they would pick up defendant's wife.

Just before defense counsel was to start her cross-examination of the officer, counsel asked the judge if she would address an issue that had just come up.  The judge responded:  "Go ahead because I'm bringing the jury out. I already called for them."[5]  That led to the following exchange:

---

[5]  The judge had just engaged in a heated exchange with defendant and his counsel over defendant's decision to leave his two young children in the rear of the courtroom unattended during the officer's direct examination, causing the judge, in her words, to "wast[e] a significant amount of time while a jury is waiting" to ensure the children would remain outside in the hallway until someone could come and pick them up.

DEFENSE COUNSEL:  The prosecutor just informed me that if I ask any questions about why the officer ran my client's information that she'd be objecting because a motion was already denied.  But my understanding is that even if the motion is denied I'm still allowed to ask.

THE COURT:  You can't ask about it.

DEFENSE COUNSEL:  Okay.

THE COURT:  I found probable cause for the stop.  We heard the motion a couple of months ago.

DEFENSE COUNSEL:  Yes.  My partner litigated about the random license check.

THE COURT:  Yes.

DEFENSE COUNSEL:  Okay.

THE COURT:  All rise for the jury please.

Complying with the court's direction, counsel did not inquire into the officer's decision to run defendant's information, confirming only that the officer asked defendant in the first minutes of the stop if he had a driver's license, and that defendant unequivocally told the officer he did not have a driver's license, but only a State I.D.  Defense counsel's only other inquiry about the issue consisted of confirming that "at some point either you or [your partner] decides to run [defendant] as well."  The officer responded that his partner "asked [defendant] for his information, yes."  Defense counsel parried: "When you already knew he didn't have a license, correct?"  The officer

16

answered, saying, "Well, he inferred [sic] that but we hadn't confirmed that yet." Defense counsel closed out her inquiry by asking, "Okay. But he didn't tell you he had one though, did he," to which the officer replied, "He did not."

After successfully blocking defendant from questioning the officer about why he asked defendant for his identification, the prosecutor addressed the issue in her closing, saying:

> yes, [the officer] asked if [defendant] had a license and he didn't. So they asked for identification. He provided an I.D. card and his name. Defendant didn't have to respond. Defense is right; he didn't have to. He could have told them to kick rocks or whatever, you know? He didn't have to give [the officer] any kind of identification but he did. And the only reason they even asked it, as you heard [the officer] explain, was because they were about to leave three young children in a car that didn't belong to this person because they had just arrested the person that it belonged to, with a man they didn't know. They didn't know defendant at the time. They didn't know who he was, you know, didn't know much about him. So they had to run — not run, sorry. They had to look up his identification, which in this case was his State I.D. card and his name to confirm that he could potentially drive this car and take these kids home.

The jury convicted defendant of third-degree simple possession of less than one-half ounce of cocaine. The expert testified the actual weight, which she only estimated due to the small quantity, was closer to a gram. As already noted, the judge granted the State's discretionary extended term motion, and subsequently sentenced defendant to seven years in State prison with three-

17

and-a-half years of parole ineligibility, rejecting the defense argument that defendant's possession of a gram of cocaine neither caused nor threatened serious harm, nor did defendant contemplate it would. The court opined that "[t]he sale and/or possession of CDS is not a victimless crime" and defendant had "demonstrated that [he is] a true menace to society, and further that the public will only be safe from [him] if [he is] in jail."

Defendant appeals, arguing:

> POINT I
>
> SUPPRESSION SHOULD HAVE BEEN GRANTED BECAUSE THE POLICE UNLAWFULLY REQUESTED IDENTIFICATION FROM MR. BOSTON, A PASSENGER, WITHOUT ANY INDICATION THAT HE WAS ENGAGED IN CRIMINAL ACTIVITY.
>
> POINT II
>
> DEFENSE COUNSEL WAS INEFFECTIVE BOTH IN FAILING TO CROSS-EXAMINE [THE] OFFICER . . . ABOUT THE DASHCAM VIDEO AT THE SUPPRESSION HEARING AND IN FAILING TO MOVE TO REOPEN THE SUPPRESSION HEARING AFTER THE OFFICER'S TRIAL TESTIMONY. (NOT RAISED BELOW)
>
> POINT III
>
> THE TRIAL COURT DEPRIVED DEFENDANT OF HIS RIGHT TO CONFRONTATION DURING THE TRIAL WHEN IT PREVENTED DEFENSE COUNSEL FROM QUESTIONING THE OFFICER

REGARDING HIS REASONS FOR SUBMITTING A DATABASE SEARCH FOR MR. BOSTON.

POINT IV

THE SENTENCING COURT'S FAILURE TO FIND MITIGATING FACTORS IN THE RECORD AND OVEREMPHASIS OF THE AGGRAVATING FACTORS RESULTED IN A MANIFESTLY EXCESSIVE SENTENCE. (NOT RAISED BELOW)

We find no error in the court's denial of the suppression motion given defense counsel's decision to stipulate the dash cam video would not differ in any significant degree from the police officer's testimony, resulting in the video not being played for the court. But that order was only interlocutory, meaning it could be revised at any time before final judgment in the interest of justice. See State v. Dispoto, 383 N.J. Super. 205, 215 (App. Div. 2006) (affirming order of the trial court reversing prior interlocutory order finding probable cause for a search warrant, based on testimony at a subsequent Miranda[6] hearing calling into question veracity of the affidavit supporting the search warrant), modified on other grounds, 189 N.J. 108 (2007).

The error here was the trial court's failure to realize the dash cam video was at odds with the testimony at the suppression hearing, specifically the officer's testimony that he and his partner only sought defendant's personal

---

[6] Miranda v. Arizona, 384 U.S. 436 (1966).

information after they had arrested the driver, defendant's wife, in order to "check the validity of his license," so as to avoid towing the car and leaving "Mr. Boston and the three children" stranded. The dash cam video makes clear the testimony the officer gave at the suppression hearing as to when he or his partner sought defendant's personal information was not accurate. The video establishes, unequivocally, the officer asked whether defendant had a valid driver's license when he first approached the car, before arresting the driver.[7] And, critically, when defendant said he had "no license" only "a State I.D.," the officer can be heard to state clearly, "Okay, let me see that."

Those new facts, not available to the judge at the suppression hearing, made it incumbent on the court to consider whether its interlocutory order denying defendant's suppression motion was sound or whether those new facts altered the analysis. We conclude the officer's demand to see defendant's State I.D. after defendant advised he did not possess a driver's license, indeed did alter the analysis and requires the reversal of defendant's conviction. See State v. Lamb, 218 N.J. 300, 313 (2014) (noting a trial court's interpretation of law "and the consequences that flow from established facts" are not entitled to

---

[7] Because the trial judge did not base any of her findings on the video, we do not transgress our customarily deferential standard of review by basing our decision on what the video shows — which neither party disputes. See State v. S.S., 229 N.J. 360, 381 (2017) (adopting the clearly mistaken or erroneous standard of appellate review for factual findings based on video recordings).

deference on appeal).  The trial court's failure to recognize it was plain error.  See R. 2:10-2; State v. G.E.P., 243 N.J. 362, 389 (2020).

We begin our analysis by noting our agreement with the trial court that the officer's decision to conduct the stop based on his random lookup of the Hyundai's license plate was unquestionably lawful.  The Court held in Donis that random license plate lookups by police using mobile data terminals are not searches subject to Fourth Amendment restrictions.  157 N.J. at 48, 54-55; cf. Kansas v. Glover, 140 S. Ct. 1183, 1186 (2020) (holding stop based on license plate lookup revealing registered owner's revoked license is reasonable "when the officer lacks information negating an inference that the owner is the driver").  Although defense counsel raised the specter of race having been the officer's hidden, improper motivation in conducting the license lookup, defendant's failure to establish even a prima facie case of selective enforcement at the suppression hearing, or at trial, made an equal protection analysis unnecessary. See State v. Segars, 172 N.J. 481, 492-96 (2002).

But establishing the legality of the stop is not the end of the inquiry here.  The issue is whether the officer lawfully commanded defendant, a passenger, to produce his State I.D. after defendant told the officer he did not possess a driver's license.  Confronted with the video evidence at trial it didn't present at the suppression hearing, the State elided that inquiry by blocking the defense

21

from inquiring into the officer's reasons for asking for defendant's I.D. and by asserting — incorrectly — that defendant volunteered his personal information.

Although we, of course, are in no way bound by a police officer's view of the legal effect of his actions, State v. Adubato, 420 N.J. Super. 167, 180 n.5 (App. Div. 2011), we take note of the arresting officer's view here, endorsed by the State, that Boston, because he "wasn't violating any laws or anything like that," was under no obligation to provide police with his personal information. While it is generally the case that individuals who are not "violating any laws," "are free to go on their way without interference from the government," as both the Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution prevent police from stopping and detaining people absent particularized suspicion, State v. Shaw, 213 N.J. 398, 409-10 (2012), the prosecutor was plainly incorrect when she highlighted that testimony, and told the jury that defendant was free to tell the officer "to kick rocks or whatever" when the officer demanded to see defendant's State I.D.

Both the officer and the State overlook that defendant, a passenger in his wife's car, was not free to leave — or to refuse to answer the officer's "demands for directed behavior" — after police stopped the car on the side of

the road.  State v. Rosario, 229 N.J. 263, 275 (2017).  The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning" of the Fourth Amendment.  State v. Dickey, 152 N.J. 468, 475 (1998) (quoting Whren v. United States, 517 U.S. 806, 809-10 (1996)).

The only time a citizen may tell a police officer, metaphorically, "to kick rocks," that is refuse to listen to what he has to say, and "walk away without answering any of [the officer's] questions," is in the course of a more casual field inquiry, when the individual has not been "seized" and remains free, judged from his perspective, to walk away.  Rosario, 229 N.J. at 271-74 (explaining "[t]he difference between a field inquiry and an investigative detention always comes down to whether an objectively reasonable person would have felt free to leave or to terminate the encounter with police. . . . measured from a defendant's perspective").

This car stop was most certainly not a field inquiry from which defendant could walk away without providing the officer his identification on demand.  See id. at 274 (distinguishing field inquiries begun as conversational interactions with a person in a parked car from investigative detentions).  Defendant was in a vehicle pulled over by the police, a classic example of a

seizure under the Fourth Amendment and Article I, paragraph 7 of the New Jersey Constitution.  See State v. Dunbar, 229 N.J. 521, 532 (2017) ("A lawful roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions."); see also Terry v. Ohio, 392 U.S. 1, 16 (1968) (explaining the importance of recognizing "that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person" within the meaning of the Fourth Amendment); Dickey, 152 N.J. at 476 (applying Terry to a car stop).

And the driver, of course, is not the only one "seized" in a roadside stop from a constitutional perspective.  It has long since been settled that a passenger in a vehicle stopped by police is seized every bit as much as the driver, Brendlin v. California, 551 U.S. 249, 251 (2007); Sloane, 193 N.J. at 431.  Because both defendant and his wife were seized when their car was pulled over by police, their encounter with the officers is measured by the rules governing an investigative detention, not those applicable to a field inquiry.

Contrary to the prosecutor's advice to the jury, an individual seized by police has no right to disobey an officer's command by telling him to "kick rocks."  See State v. Crawley, 187 N.J. 440, 443-44 (2006) (noting a "[d]efendant's obligation to comply with [a police] command did not depend

A-4752-17

on how a court at some later time might decide the overall constitutionality of the street encounter").  As the Court recently explained in <u>Rosario</u>, "[c]ase law tells people to obey words and deeds of law enforcement that communicate demands for directed behavior and to raise constitutional objections thereafter."  229 N.J. at 275.  Because defendant's compliance with the officers' demands for his identification was not voluntary, as asserted by the State at trial, but mandated by law, the validity of defendant's arrest, search incident to that arrest and the seizure of the cocaine in his jacket pocket all turn on whether the officers' demands for defendant's identification were lawful.[8]  <u>See</u> <u>Wong Sun v. United States</u>, 371 U.S. 471, 485 (1963) (barring the State from introducing into evidence the "fruits" of an unlawful search or seizure); <u>State v. Maryland</u>, 167 N.J. 471, 489 (2001) ("If the field inquiry or

---

[8]  We also note the facts presented in the arresting officer's dash cam video do not support the State's position that defendant "volunteered" his personal information as, for example, one might construe the defendant's response in <u>State v. Coles</u>, 218 N.J. 322, 329 (2014) (noting the defendant, subject to a stop and frisk on his own block, provided officers his address but could not produce identification to prove who he was and where he lived, offering instead that relatives could identify him at the address he provided).  Here, defendant complied with the officer's demands, he did not willingly volunteer any information.  <u>See</u> <u>State v. Carty</u>, 170 N.J. 632, 646 (2002) (acknowledging that consent searches following valid road stops are not voluntary if people feel compelled to consent); <u>see also</u> <u>Arizona v. Johnson</u>, 555 U.S. 323, 333 (2009) (noting "'consensual' is an 'unrealistic' characterization" of an encounter in which police questioned a passenger following a road stop, asked him to step out of the car and patted him down for weapons).

investigatory stop was defective, then the 'seizure' must be deemed constitutionally defective and the drugs seized must be regarded as the 'fruit of the poisonous tree' and the evidence suppressed.").

We answer that question — whether the officers' demands for defendant's identification were lawful — by employing the two-prong test adopted in Terry, which requires us to consider "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 20; Dickey, 152 N.J. at 476 (explaining courts employ the Terry standard to measure the reasonableness of a detention following a valid traffic stop). As the stop was lawful, which defendant concedes on appeal, we consider whether the officers' actions in demanding defendant's State I.D. and personal information were "reasonably related in scope to the circumstances which justified the interference in the first place."

Because the driver had to be arrested on the open traffic warrant, we find nothing improper in the arresting officer asking defendant, the only other adult in the car, if he possessed a valid driver's license. See Sloane, 193 N.J. at 432 (finding it reasonable for a police officer to ask a passenger, who requested keys to the car following the arrest of the driver, for identification "to ensure that the car would be driven by a properly licensed driver"). That inquiry was

26

reasonably related in scope to the driver's suspended license, the circumstance which justified the car stop in the first instance, and the subsequently confirmed warrant for her arrest. Because the driver could not legally drive the car away, it was reasonable for the officer to inquire whether defendant was in a position to do so. See State v. Alston, 279 N.J. Super. 39, 46 (App. Div. 1995) (noting officer could "reasonably have asked" passengers if they could drive the car following arrest of the driver).[9]

Once defendant told the officer he wasn't a licensed driver, however, the officer had no lawful basis, on these facts, to demand to see defendant's State I.D. or to request his personal information. Our Supreme Court has made clear "passengers are different from drivers," and New Jersey is more solicitous of passengers' rights than is the federal government. State v. Bacome, 228 N.J. 94, 104-07 (2017) (tracing New Jersey's history of according auto passengers more protections than federal law "consistent with [our Supreme] Court's interpretation of the State Constitution to provide greater protection against

---

[9] We doubt our further holding in Alston — that police could order passengers out of a car after arrest of the driver in order to check the passengers' driving credentials and ensure they were "physically capable of operating the vehicle," notwithstanding that circumstances did not demand "heightened awareness of danger," 279 N.J. Super. at 45-46 — remains good law in light of the Court's express admonition in State v. Bacome, 228 N.J. 94, 107 (2017), that "officers may remove passengers only when the circumstances present reason for heightened caution."

A-4752-17

unreasonable searches and seizures than the Fourth Amendment").  See also State v. Smith, 134 N.J. 599, 617-18 (1994) (declining to extend to passengers the per se rule of Pennsylvania v. Mimms, 434 U.S. 106 (1977), which permits police to routinely order a driver to get out of the car following a routine traffic stop).[10]  That's because we recognize a passenger, albeit seized along with the driver, "has not engaged in the culpable conduct that resulted in the vehicle's stop," giving rise to a passenger's "legitimate expectation" that he or she will not be "further inconvenience[d] . . . by any intrusions beyond the delay caused by the lawful stop."  Smith, 134 N.J. at 615.

So, for instance, in New Jersey, although police may routinely ask a driver stopped for a traffic violation to get out of the car, "an officer must be able to point to specific and articulable facts that would warrant heightened caution" to order a passenger to do so.  Id. at 618.  Our rule both respects the passenger's privacy and liberty interests and acknowledges that passengers may pose the same risk to a police officer's safety as would the driver.  Id. at 612.  If the police officer can point to specific facts that would cause a reasonably prudent officer to exercise heightened caution when dealing with the passengers, their suspicious movements in a car stopped on the Turnpike in

---

[10]  The United States Supreme Court extended the Mimms rule to passengers in Maryland v. Wilson, 519 U.S. 408, 410 (1997).

A-4752-17

the middle of the night for instance, the intrusion on their liberty occasioned by ordering them to step out of the car is justified under Article I, paragraph 7 of the New Jersey Constitution by the important concern for officer safety. Id. at 618-19.

Applying that settled law to these facts, it is readily apparent the officer asking whether defendant was a licensed driver was reasonable in light of the driver's suspended license and traffic warrant. Further, if defendant had declared himself a licensed driver who could drive the car away with the owner's consent, it would have been reasonable and within the scope of the stop for the officer to ask to see the license and to verify its validity in a license lookup. See State v. Terry, 232 N.J. 218, 233 (2018) (noting the State's "compelling interest in maintaining highway safety by ensuring that only qualified drivers operate motor vehicles") (quoting Donis, 157 N.J. at 51). The passenger at that point would be assuming the responsibilities of a driver, diminishing his legitimate expectation of privacy by the altered balance necessitated by the State's interest in highway safety. See United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) (explaining "the reasonableness" of a "seizure" occasioned by a car stop depends, "[a]s with other categories of police action subject to Fourth Amendment constraints, . . . on a balance between the public interest and the individual's right to personal security free

29

from arbitrary interference by law officers"). "Because of the State's extensive regulation of its highways and thoroughfares, '[e]very operator of a motor vehicle must expect that the State, in enforcing its regulations, will intrude to some extent upon that operator's privacy.'" Donis, 157 N.J. at 51-52 (quoting New York v. Class, 475 U.S. 106, 113 (1986)).

But we fail to see the justification for the officer demanding to see defendant's State I.D. or requiring him to provide his name and date of birth after defendant said he did not possess a driver's license, but only a State I.D. Cf. State v. Chisum, 236 N.J. 530, 549-51 (2019) (holding police called to motel for noise complaint had no basis to detain or run warrant checks on occupants of motel room when police determined not to issue summons after renter immediately turned the music down). Because defendant was not seeking to drive the car away, there was no need to "confirm" defendant was unlicensed or "make sure" the license defendant claimed not to have "wasn't actually valid so [the officers] could turn the vehicle over to [defendant]," as the officer testified. Defendant expressed no intent to operate the vehicle, and he didn't need to be licensed in order to accept custody of it from the driver, the registered owner.

Even in a stop and frisk where police focus is on the individual detained, unlike with a hapless auto passenger, the Court has held police need

30

reasonable suspicion in order to continue the detention to confirm an individual's identity. State v. Coles, 218 N.J. 322, 346 (2014) (noting "[w]hile individuals are not required to carry identifying documents on them at all times in our free country, we accept that law enforcement acting under reasonable suspicion of an individual can expend a brief but reasonable period of time to confirm an individual's identity" while investigating a nearby, reported armed robbery). The officer testified Boston had done nothing to arouse any suspicion of wrongdoing. If police were concerned that defendant might drive away following their departure, they could have simply taken custody of the keys when they left for the station house with the driver or waited for defendant's sister to arrive, as they did. See State v. Davis, 104 N.J. 490, 504 (1986) (noting the requirement for law enforcement to use "the least intrusive investigative techniques reasonably available" under the circumstances to justify the scope of the seizure).

Neither highway safety nor officer safety justified this intrusion on defendant's legitimate expectation of privacy as a passenger in his wife's car. Indeed, neither concern was implicated in any fashion. Like the defendant passenger in Smith, the only justification for the intrusion on defendant's privacy, here the demand for his identification, was his "untimely association with the driver on the day the driver [was] observed committing a traffic

31

violation," as a result of the officer's random selection of her license plate. Smith, 134 N.J. at 615. In sum, the officers demanding to see Boston's State I.D. and asking for his personal information after he told them he did not possess a driver's license was not "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20.

We do not forge our own path in deciding the officers were not justified in demanding identification from defendant here. We held nearly twenty years ago in Hornberger v. Am. Broad. Cos., Inc., 351 N.J. Super. 577, 613 (App. Div. 2002), that police may not request a passenger's identification after stopping a vehicle for a routine traffic violation. There, police in Jamesburg pulled over three young African-American men in a Mercedes-Benz after the driver changed lanes without signaling. Id. at 585. Police demanded identification from both the driver and his two passengers. Ibid. When the backseat passenger told the officers he didn't have I.D., they ordered all three young men "out of the car, frisked them, searched the car's interior, found no contraband, and released them." Ibid. Unbeknownst to the officers, the young men had been recruited by the producers of PrimeTime Live for a segment called "DWB" (Driving While Black), and the entire stop had been captured by hidden cameras. Id. at 585-86.

Writing for the court, Judge King underscored the officers "did not reasonably suspect the passengers of any crime when they demanded their identification," noting "[t]he passengers had done nothing more suspicious than riding in a car whose driver failed to signal a lane change." Id. at 611-12. After carefully examining out-of-state authority on the question[11] and this court's and the Supreme Court's precedents, Judge King wrote that finding improper the officers' request for identification from passengers following a routine traffic stop was the view "most consistent with our Supreme Court's decision in [State v.] Carty[12] and the prophylactic purpose of discouraging the

---

[11] The court took particular note of a Massachusetts case, Commonwealth v. Alvarez, 692 N.E.2d 106, 107-09 (Mass. App. Ct. 1998), in which Massachusetts' intermediate appellate court held that requesting identification from passengers in a car stopped for a traffic offense, without any objective suspicion of criminality, violated that state's constitution and was "the sort of request uncomfortably associated with authoritarian societies and most commonly made of persons belonging to a racial or ethnic minority." Hornberger, 351 N.J. Super. at 613 (quoting Alvarez, 692 N.E.2d at 109).

[12] The Court in Carty affirmed Judge Pressler's opinion "that consent searches following a lawful stop of a motor vehicle should not be deemed valid under [State v.] Johnson, [68 N.J. 349, 353-54] unless there is reasonable and articulable suspicion to believe that an errant motorist or passenger has engaged in, or is about to engage in, criminal activity." 170 N.J. at 647. It explained:

> In other words, we are expanding the Johnson two-part constitutional standard and holding that unless there is a reasonable and articulable basis beyond the initial valid motor vehicle stop to continue the

A-4752-17

police from turning a routine traffic stop into a 'fishing expedition for criminal activity unrelated to the stop.'" Id. at 614 (quoting State v. Carty, 170 N.J. 632, 647 (2002)).

The State urges us to ignore our holding in Hornberger because it was rendered in a civil case; it is at odds with our holdings in State v. Sirianni, 347 N.J. Super. 382 (App. Div. 2002), and State v. Hickman, 335 N.J. Super. 623 (App. Div. 2000); "[t]he circumstances in Hornberger were quite different" from those in this stop; and the case has been implicitly overruled by Sloane. We reject each of those arguments as without merit. We discuss them in turn.

Litigants are not free to pick and choose among precedential holdings based on which division of the trial court a suit was started. One need only consider the Supreme Court's recent decision in Brown v. State, 230 N.J. 84,

<div style="margin-left:2em">

detention after completion of the valid traffic stop, any further detention to effectuate a consent search is unconstitutional. A suspicionless consent search shall be deemed unconstitutional whether it preceded or followed completion of the lawful traffic stop. The requirement of reasonable and articulable suspicion is derived from our State Constitution and serves to validate the continued detention associated with the search. It also serves the prophylactic purpose of preventing the police from turning a routine traffic stop into a fishing expedition for criminal activity unrelated to the stop. Indeed, our holding is consistent with both the State Police Standard Operating Procedures and the Consent Decree that was entered into by the State Police on December 29, 1999.

</div>

34

111-12 (2017), a civil case in which the Court announced that "law enforcement officials may not rely on [Illinois v.] McArthur[, 531 U.S. 326 (2001)][13] to enter an apartment to secure it while awaiting a search warrant," but instead "must get a warrant and, if reasonably necessary, may secure the apartment for a reasonable period of time from the outside," to understand our rejection of the State's first argument. That the Court declared the officers' entry into Brown's home without a warrant unconstitutional in the context of a civil suit against the officers who unlawfully entered her home and found no contraband, instead of on a motion to suppress contraband seized in a criminal case, does not make that holding — and the Court's instruction as to how law enforcement is to secure a home while awaiting a warrant in this State in the future — any less binding.

The State's second argument, that Hornberger is at odds with Sirianni and Hickman, is simply incorrect. The State relies on Sirianni for the proposition that "the rule is that a police request for identification does not, by itself, constitute a seizure or detention within the meaning of the Fourth Amendment." 347 N.J. Super. at 390. Seemingly true — by itself — but as in

---

[13] The United States Supreme Court in McArthur held a warrantless seizure of a person to prevent him from returning to his trailer to destroy marijuana hidden inside was not "per se unreasonable" because "[i]t involve[d] a plausible claim of specially pressing or urgent law enforcement need, i.e., 'exigent circumstances.'" 531 U.S. at 331.

any search and seizure case, context is critical. See Rosario, 229 N.J. at 273-74 (noting officer's immediate request for the defendant's identification "[a]lthough not determinative," reinforced the encounter was an investigative detention and not a field inquiry) (citing State v. Egan, 325 N.J. Super. 402, 410-11 (App. Div. 1999) (holding officer's immediate demand for "driving credentials" on approaching the defendant's parked van elevated field inquiry into constitutional seizure)).

In Sirianni, we succinctly summed up the context for the statement the State relies on from the opinion: "during a police stakeout to capture a homicide suspect, defendant [Sirianni] pulls up at 2:20 a.m., parks his vehicle directly across from the surveillance location, in a neighborhood in which he apparently did not live, and remains in the car apparently observing police activity." Id. at 391. We explained we had then only recently held in State v. Stampone, 341 N.J. Super. 247 (App. Div. 2001), that a police officer could approach an individual in a parked car, engage him in conversation and ask him for identification, which the individual remained free to refuse. Sirianni, 347 N.J. Super. at 391. Seeing "no reason to depart from the general rule that a request for identification does not, in and of itself, transform a field inquiry into a Terry stop," the Sirianni court expressed its continued adherence "to the general standard of reasonableness, measured against the totality of the

36

circumstances including, in the mix, the seriousness of the criminal activity and the degree of police intrusion involved." Ibid. Applying that standard, the court found "the police officer's action in requesting identification from [Sirianni] required no constitutional justification" and was "a reasonable and proper course." Id. at 391-92.

We decided Sirianni only three months before we decided Hornberger. Judge King, who wrote Hornberger, was aware of Sirianni of course and indeed relied on it in holding that the officers' initial request for the passengers' identification in Hornberger was unreasonable. Hornberger, 351 N.J. Super. at 612-13. Noting the very different circumstances present in Sirianni, specifically, Sirianni driving his car after 2:00 a.m. into the middle of a stakeout for a homicide suspect, where he appeared to watch the officers from his parked car, Judge King readily agreed "that 'the officers would have been derelict in their duties if they had failed to investigate'" Sirianni's presence by asking who he was and what he was doing there. Id. at 612 (quoting Sirianni, 347 N.J. Super. at 391).

In contrast, Judge King noted the officers who stopped the three young African-American men in the Mercedes-Benz in Hornberger, "were not investigating a crime, and there was no cause to suspect that the [three] were armed, dangerous, or involved in any criminal activity." Hornberger, 351 N.J.

37

Super. at 612. Even more important, he explained, "the court in <u>Sirianni</u> noted that 'nothing in the encounter conveyed to [Sirianni] that he was not free to refuse the officers' request,'" whereas in <u>Hornberger</u>, the backseat passenger without I.D. "was not free to refuse the request: when he failed to produce his identification, the officers ordered all of the occupants out of the car and frisked them." <u>Id.</u> at 612-13. Judge King concluded that "[c]onsidering the totality of these circumstances, in accordance with the principles expressed in <u>Sirianni</u>, the initial request for the passengers' identification was unreasonable" in <u>Hornberger</u>. <u>Id.</u> at 613.

The case before us, with defendant and his wife coming home from the movies in Cherry Hill at 8:30 p.m. on a Saturday night with their three children in the backseat, is obviously a great deal closer to the facts in <u>Hornberger</u> than to those in <u>Sirianni</u>. But the critical factor that distinguishes this case from <u>Sirianni</u> is the same thing that distinguished <u>Sirianni</u> from <u>Hornberger</u>: defendant, like the backseat passenger in <u>Hornberger</u>, was already lawfully seized when the officer demanded his identification, it wasn't a voluntary encounter and he wasn't free to refuse the officer's request.[14] <u>See</u>

---

[14] That makes this case and <u>Hornberger</u> much closer to <u>Rosario</u>, than to <u>Sirianni</u>. The Court in <u>Rosario</u> found a person in a lawfully parked car outside her home blocked in by a patrol car driven by an officer demanding her identification and driver's license "would not reasonably feel free to leave."

A-4752-17

Rosario, 229 N.J. at 275 ("Case law tells people to obey words and deeds of law enforcement that communicate demands for directed behavior and to raise constitutional objections thereafter.").

Hornberger is not inconsistent or at odds with Sirianni; both cases were judged using the same "general standard of reasonableness, measured against the totality of the circumstances including, in the mix, the seriousness of the criminal activity and the degree of police intrusion involved," Sirianni, 347 N.J. Super. at 391; Hornberger, 351 N.J. Super. at 613.  The two cases simply address very different factual scenarios, resulting in different legal conclusions.  See Stampone, 341 N.J. Super. at 252 (noting the evaluation of an individual's encounter with police "is always fact-sensitive and similar facts, when mixed and matched with other circumstances, will produce varying legal conclusions").

---

The Court reversed our opinion, which had reasoned that because Rosario was parked in front of her home, she was free to leave, thus making the encounter (in accordance with Stampone) a field inquiry, which the officer's request for her credentials didn't elevate to an investigative detention based on Sirianni. Rosario, 229 N.J. at 266-67, 273, reversing State v. Rosario, No. A-0677-14 (App. Div. Mar. 10, 2016) (slip op. at 8).  The Court stressed the totality of the circumstances made the case "not analogous to the few cases in this state addressing an officer's less dramatically begun, more casual and conversational interactions with a person in a parked car, which have generally been viewed as field inquiries involving a lesser degree of intrusiveness than a motor vehicle stop." Id. at 274.

Hickman is not at odds with our holding in Hornberger either. Hickman was a passenger in a car stopped by police after midnight. Hickman, 335 N.J. Super. at 628. When the officer confirmed the driver's license had been revoked and he could not produce the car registration, the officer asked defendant and another passenger if either possessed a valid license. Ibid. Both said no. According to the officer, Hickman looked "extremely nervous," refusing to make eye contact and "shifting his weight from one side to the other," prompting the officer to comment on Hickman's nervousness and ask if he had "got something on [him] that [he] should surrender right now? Any contraband, weapons, anything like that[?]" Ibid. Hickman told the officer he had something in his shoe and surrendered a small bag of cocaine. Ibid.

We found the officer's brief questioning did not infringe on Hickman's rights. Id. at 629. We wrote that because Hickman and the other passenger told the officer that neither had a license, "and the driver could not produce a registration or other evidence of ownership, [the officer] had an objectively reasonable basis to detain the car and its occupants to assure that the car was driven only by a properly licensed driver and to confirm that it was not stolen." Hickman, 335 N.J. Super. at 635. See also State v. Terry, 232 N.J. at 222 (noting state law provides police the right to request proof of ownership from the driver during routine traffic stop to ensure driver is not operating a stolen

car). While noting that police may question occupants of a lawfully stopped car, "even on a subject unrelated to the purpose of the stop, without violating the Fourth Amendment, so long as such questioning does not extend the duration of the stop," — the statement on which the State relies — we found the officer had objectively reasonable suspicion that Hickman was involved in some criminal activity to justify the questions. Hickman, 335 N.J. Super. at 636.

Specifically, we noted that because the driver didn't have a license or registration or any other proof he owned the car Hickman was traveling in, it was reasonable for the officer to conduct a further investigation "to determine whether any of the other occupants owned or had permission to use the car," the "most obvious" method being "additional questioning." Id. at 637. When Hickman responded to the officer's questions with unusual nervousness, we saw a reasonable basis for the officer's enhanced suspicion, permitting him "to broaden the scope of his inquiries." Ibid. Because the additional inquiry regarding "possession of contraband or a weapon was brief and no more intrusive than required to determine whether [Hickman] and his companions were operating the car without permission of the owner or engaged in other unlawful activity," we found the "inquiry satisfied the ultimate Fourth

Amendment 'touchstone' of 'reasonableness.'" Id. at 638 (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)).

We find no inconsistency between our opinions in Hornberger and Hickman. As with Sirianni, both cases were measured against the same "touchstone" of "reasonableness" in view of the totality of the circumstances confronting the officer. More important, the issue we addressed in Hornberger was not police questioning a passenger to confirm or dispel some reasonable suspicion, as in Hickman, it was demanding the passenger's identification without any suspicion of wrongdoing, the same issue we confront here.

The State's third argument, that the facts in this case are too dissimilar to Hornberger to warrant its application here, requires but brief comment. Unlike Sirianni's field inquiry of an individual in a parked car in the vicinity of a stakeout for a homicide suspect in the middle of the night, or Hickman's stop of a driver without a license and no proof he either owned the car or was using it with permission of the owner, the drivers of the cars pulled over in Hornberger and in this case both produced license and registration to the officer on request, although the driver's license here had been suspended on account of a traffic warrant. In both cases, police demanded identification from a passenger without any suspicion of criminal wrongdoing. While the three young African-American men in Hornberger were subsequently ordered

42

out of the car, frisked, and their car searched without consent, the officer testified in that case that he ordered the occupants out of the car because the backseat passenger "did not produce identification." Hornberger, 351 N.J. Super. at 592. Far from being factually dissimilar, Hornberger to us appears "on all fours."

Finally, we cannot agree with the State's assertion that we should reject Hornberger because the Supreme Court implicitly overruled it in Sloane. As in this case, the driver in Sloane was pulled over by police on the suspicion her license was suspended. 193 N.J. at 426. She was driving a car owned by one Carmichael, whose nephew, Sloane, was in the front seat. Ibid. When police signaled the driver to pull over, she pulled into a parking spot across from Carmichael's home. Ibid. She produced her driver's license in response to the officer's request, and he confirmed it was suspended. The officer then "ran the information through the NCIC database," found an outstanding warrant, and arrested the driver. Ibid.

When Sloane thereafter requested the keys to take to his uncle, the officer asked to see his license. Ibid. Sloane claimed he didn't have it with him, but provided the officer with his name, birthdate and social security number. Ibid. Entering the information into his mobile data terminal, the officer learned Sloane's license was also suspended. Id. at 426-27. While the

43

officer was performing that task, another officer ran Sloane's information through NCIC, finding a parole violation and two outstanding warrants. Id. at 427. Sloane was arrested, and a search incident at the station house revealed crack cocaine in one of his shoes. Ibid.

The Court held Sloane was seized at the time of the stop under the federal and state constitutions, and that police do not need reasonable suspicion before accessing the NCIC database. Id. at 426. "Because the decision to check the NCIC database was within the scope of the traffic stop and did not unreasonably prolong" it, the Court found no basis to suppress the evidence recovered in the search incident to Sloane's arrest. Ibid.

The State's basis for arguing that Hornberger has been implicitly overruled is the Court's holding in Sloane that "an NCIC check is not a search under the federal or state constitutions" because an individual has "no reasonable expectation of privacy in the public records maintained in NCIC." Id. at 436-37. Thus, police do not need reasonable and articulable suspicion of criminal activity to access the NCIC database. Ibid.

But the State overlooks the Court's further discussion of whether there are "other constitutional concerns when police access the NCIC database during a traffic stop[.]" Id. at 437. Writing for the Court, the Chief Justice explained "[t]hat question turns on the reasonableness of the detention

following a lawful traffic stop in two interconnected respects.  First, was the detention 'reasonably related in scope to the circumstances which justified the interference in the first place?'"  Ibid.  (citing Dickey, 152 N.J. at 476 (quoting Terry, 392 U.S. at 20)).  "Second, did the NCIC check unreasonably prolong the length of the stop?"  Ibid.  (citing United States v. Sharpe, 470 U.S. 675, 685 (1985) ("in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria")).

Considering the first criterion, the Chief Justice noted "[m]any jurisdictions have found that running an NCIC check, in addition to a driver's license check, is within the scope of a traffic stop and is permissible so long as it does not unreasonably extend the time of the stop."  Ibid.  He further noted "[t]hat rule has also been applied to NCIC checks of passengers when there was a basis for police to focus on the passenger."  Id. at 438 (emphasis added) (citing State v. Higgins, 884 P.2d 1242, 1245 n.2 (Utah 1994) (license check on passenger looking to drive the car away permissible and warrant check did not significantly extend the time necessary to run license check); State v. Mennegar, 787 P.2d 1347, 1351-52 (Wash. 1990) (finding check of passenger's driver's license, which revealed outstanding arrest warrant, valid where

45

passenger was asked to drive car), overruled on other grounds, State v. Hill, 870 P.2d 313, 315 (Wash. 1994)).

The basis for police to focus on Sloane was his request for the car keys following the driver's arrest. The Court found specifically that "after Sloane asked for the keys to the car, it was reasonable for the officer to ask Sloane for identification to insure that the car would be driven by a properly licensed driver." Id. at 432. Because checking Sloane's license was within the scope of the stop after Sloane asked for the car keys, and the NCIC check, for which no reasonable suspicion was required, was performed at the same time, thus not adding appreciably to its length, the Court held "police acted within the boundaries of the federal and state constitutions throughout the traffic stop." Id. at 439.

In deciding Hornberger, we did not discuss either license checks or NCIC checks. We held only that the request for the passengers' identification following a routine traffic stop without any reasonable suspicion of criminal activity was improper. Hornberger, 351 N.J. Super. at 614. Far from overruling Hornberger, the Court's decision in Sloane reinforces its vitality. Sloane makes clear a demand for a passenger's identification or check of his license is permitted when police have a basis for focusing on the passenger. 193 N.J. at 438-39. In Sloane, a demand for the passenger's license and

identification was permissible because he asked police to give him the car keys, making it "reasonable for the officer . . . to insure that the car would be driven by a properly licensed driver." Id. at 432. In Hornberger, a similar demand was deemed unreasonable because police had no basis for focusing on the passengers. The driver in Hornberger produced a valid license and registration and police "did not reasonably suspect the passengers of any crime when they demanded their identification. The passengers had done nothing more suspicious than riding in a car whose driver failed to signal a lane change." 351 N.J. Super. at 611-12. Search and seizure cases are notoriously fact-sensitive. That "similar facts, when mixed and matched with other circumstances, will produce varying legal conclusions," Stampone, 341 N.J. Super. at 252, do not make cases inconsistent.

Sloane continued the Court's greater solicitude for a passenger's privacy and liberty interests, consistent with officer safety, begun in Smith, 134 N.J. at 617 (declining to extend the per se rule of Mimms to passengers), continued in State v. Mai, 202 N.J. 12, 22 (2010) (seeing "no reason to depart from the elegant reasoning" of Smith in ruling police may open passenger-side door only on showing of heightened awareness of danger), and more recently retraced in Bacome, 228 N.J. at 106 (noting "[n]o decision since Smith, including Sloane, has implicitly or explicitly modified or overruled [the]

47

decision in Smith" that "officers may remove passengers only when the circumstances present reason for heightened caution"). Our courts continue to recognize "that passengers are different from drivers 'because the passenger has not engaged in the culpable conduct that resulted in the vehicle's stop.'" Bacome 228 N.J. at 105 (quoting Smith, 134 N.J. at 615).

As our Supreme Court has held, a passenger in a car lawfully stopped by police "has a legitimate expectation that no further inconvenience will be occasioned by any intrusions beyond the delay caused by the lawful stop." Smith, 134 N.J. at 615. We do not accept the brief questioning of a passenger we permitted in Hickman to encompass a police officer's request to see a passenger's driver's license or other identification in the absence of particularized suspicion following a routine traffic stop. See Hornberger, 351 N.J. Super. at 613.

Our rationale for permitting the questioning of a passenger during the course of a routine car stop in Hickman was that the passenger was free not to answer the officer's questions. See Hickman, 335 N.J. Super. at 636-37 (explaining "appellants cannot complain of questioning that took place during the pendency of a computer check. While appellants were under no obligation to answer the questions, the Constitution does not forbid law enforcement officers from asking") (quoting United States v. Shabazz, 993 F.2d 431, 437

48

(5th Cir. 1993)).[15] But as we held in <u>Hornberger</u> and the Court made clear in

<u>Rosario</u>, that's not true of a request or demand for I.D. after the individual is

seized.

---

[15] That rationale has in the years since <u>Hickman</u> was published been somewhat undermined by the United States Supreme Court's decision in <u>Hiibel v. Sixth Judicial Dist. Court</u>, 542 U.S. 177 (2004), upholding Nevada's "stop and identify" statute. The Court acknowledged it had since <u>Terry</u> "recognized that a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further," including by asking a suspect to identify himself, <u>see e.g</u>, <u>Hayes v. Florida</u>, 470 U.S. 811, 816 (1985), but noted "it has been an open question whether the suspect can be arrested and prosecuted for refusal to answer." <u>Hiibel</u>, 542 U.S. at 185-87. <u>But see</u> <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439-40 (1984) (stating an officer conducting a <u>Terry</u> stop "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.").

The Court in <u>Hiibel</u> answered that "open question" by holding the Fourth Amendment did not prohibit a state from arresting and prosecuting an individual under state law for refusing to give his name in a <u>Terry</u> stop. 542 U.S. at 187-88. Important for our purposes, however, is the Court's underscoring that "an officer may not arrest a suspect for failure to identify himself if the request for identification is not reasonably related to the circumstances justifying the stop," because of <u>Terry</u>'s requirement that "a <u>Terry</u> stop must be justified at its inception and 'reasonably related in scope to the circumstances which justified' the initial stop." <u>Id.</u> at 188-89 (quoting <u>Terry</u>, 392 U.S. at 20). Because the request for Boston's identification after he unequivocally told the officers he was not a licensed driver was not "reasonably related in scope to the circumstances which justified the initial stop," <u>Hickman</u>'s rationale does not support the request for identification from Boston here even without reference to our Supreme Court's holdings in <u>Rosario</u> and <u>Sloane</u>.

Because a passenger during even a routine traffic stop in New Jersey is not free to ignore an officer's direction to produce his driver's license or other identification, the rationale relied on by the State to support questioning a passenger — that because the passenger is under no obligation to answer, the officer is free to ask — cannot justify the intrusion. That the passenger has already been detained as a result of the lawful stop of the driver is also not sufficient justification to further intrude on his privacy by a demand that he produce a driver's license or other identification in the absence of some basis for police to focus on the passenger. See Sloane, 193 N.J. at 438-39; cf. Carty, 170 N.J. at 640 ("[t]he fact that the motorist already has been detained at the point when an officer asks for consent to search is not dispositive of whether a suspicionless search should be allowed to continue").

Following the Court's reasoning in Smith, because "the only justification for the intrusion on the passenger's privacy," here the request for his State I.D. and personal information, "is the untimely association with the driver on the day the driver is observed committing a traffic violation," a routine request for identification from a passenger is a greater intrusion on the passenger's privacy than it is on the driver's privacy. 134 N.J. at 615. Absent some "basis for police to focus on the passenger," Sloane, 193 N.J. at 438, a request for identification, which the passenger is not at liberty to refuse, is an

50

unreasonable interference with his "legitimate expectation" that he will suffer "no further inconvenience . . . by any intrusions beyond the delay caused by the lawful stop," and unlawful, <u>Smith</u>, 134 N.J. at 615.

Although the State makes much of the presence of the couple's children in the backseat, writing in the first lines of its brief that "the lawful and well-intentioned conduct of . . . [the] officers . . . ensured the safety of [our] most vulnerable citizens, children," we don't find the children's presence changes the analysis here. There is nothing in this record to indicate the children were at any risk left in defendant's custody.

As evidenced by the officer's statement to defendant quoted at the top of this opinion, the car was "on a [residential], municipal road," and properly parked, "not in the middle of the road or anything like that." Before running his identification, the officer appeared to have no concern about leaving the car and the children in defendant's custody, telling him: "Obviously, if you don't have a license, I'm not going to tell you you are allowed to drive or whatever. But you have a cell phone on you, right? You can start to make arrangements, okay. I trust you, you are an adult." The driver, defendant's wife, the woman

51

police presumed to be the children's mother, expressed no concern with that arrangement.[16]

The car was safely parked, defendant's wife, the registered owner of the car, was satisfied to leave her car and their children in defendant's care, defendant had a working cell phone and family nearby who could come, take custody of the car and drive defendant and the children to the station house, which was only a mile or so away. Indeed, defendant's sister and another person, possibly his brother, arrived shortly after he called them, and his sister drove defendant's wife's car with the children to the station house, while the other person followed.[17]

The State does not suggest the officers had any reason to doubt defendant and his wife were not the children's parents. Indeed, the officer testified at the suppression hearing he waited to handcuff defendant until his sister arrived so he wouldn't have to arrest defendant "in front of his children,"

---

[16] The video makes clear the driver became concerned about the children's welfare only when she was advised that defendant was also being arrested.

[17] While police had defendant's sister execute a juvenile release form before letting her drive the Hyundai to the station house, there is nothing in the record to suggest the officers were preparing such a form for defendant to take custody of his own children.

A-4752-17

a fact that judge remarked on in her ruling.[18]  We do not suggest the officers could not seek to verify a child in an individual's custody was the person's child and safe in his care under other circumstances.  Alert and quick-witted officers have saved children from adults intending them harm before.  See, e.g., State v. Parker, 503 A.2d 809, 812 (N.H. 1985) (car stop based on officer's reasonable suspicion a child he saw inside camper was abused or abducted).

But these officers had no objective basis for any reasonable suspicion of risk to the children here, and a rule permitting officers to run identification checks on any passenger in a stopped car with children inside would represent a serious intrusion with no apparent commensurate benefit.  Cf. Chisum, 236 at 551 (holding "it would be both burdensome and problematic if at every public

---

[18]  The judge also commented on the officers' good faith, which the State stresses in its brief.  We have no reason to doubt the officers' good faith.  We have not commented on the testifying officer's credibility, which we are in no position to judge, and accept he may have simply forgotten he asked defendant for his driver's license in the first minutes of the stop and when told defendant did not have a license but only a State I.D., demanded to see it.  We also note an apparent exchange in the video after defendant's arrest, which is not well-captured in the transcript, in which defendant apparently asks the officers not to tell his wife "he's using again," and the officers assure him they would not tell her, and that what he told her was up to him.  Although the video makes clear the officers conducted themselves with the utmost professionalism and goodwill throughout, our inquiry is focused on whether they acted lawfully, which the officers' good faith will not change.  See State v. Arthur, 149 N.J. 1, 8 (1997) (noting an arresting officer's subjective good faith cannot justify an infringement of a citizen's constitutionally guaranteed rights).

gathering where a noise complaint was reported, responding police officers would be allowed to detain and run warrant checks on each and every individual in attendance"). Indeed, the State does not offer how a license lookup would have confirmed defendant was the children's father and they were safe in his care, or how that investigative method was "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Davis, 104 N.J. at 502 (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). The community-caretaking doctrine, on which the State relies, has never been applied so broadly. See State v. Edmonds, 211 N.J. 117, 143 (2012) (instructing "[t]he community-caretaking doctrine is an exception to the warrant requirement, not a roving commission").

Our holding is simple. In a routine traffic stop where the driver has to be arrested on an open traffic warrant, the officer's asking whether a passenger is a licensed driver is reasonable; but when the passenger claims he does not possess a license, the officer's further demand for identification from the unlicensed passenger in the absence of particularized suspicion is not.

Because we conclude the officers' demand for defendant's State I.D. and their request for his personal information exceeded the scope of this routine traffic stop, defendant's subsequent arrest on the open traffic warrant was unlawful, and the drugs seized in the ensuing search incident to his arrest

A-4752-17

should have been excluded at trial. See Maryland, 167 N.J. at 489 (explaining application of the exclusionary rule to the fruits of an unlawful stop). We accordingly reverse defendant's conviction for third-degree possession of cocaine. Our disposition makes unnecessary any discussion of defendant's remaining points.[19]

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[19] Because we have reversed defendant's conviction, we have no need to review his arguments addressing his seven-year extended term sentence with three-and-a-half years of parole ineligibility for possession of approximately one gram of cocaine, including the court's rejection of mitigating factors one and two, because "[t]he sale and/or possession of CDS is not a victimless crime." We have, however, cautioned before about the perils of the "and/or" construction for courts and judges. See State v. Gonzalez, 444 N.J. Super. 62, 71 (App. Div. 2016) (noting "[t]he imprecision of the phrase 'and/or' and criticism for its use here and in other jurisdictions has been well-documented"). We perceive employing it so as not to distinguish between the possession and distribution of CDS to support a sentence where defendant is charged only with a possession offense and has argued for application of mitigating factors one and two could be problematic. See State v. Cullen, 351 N.J. Super. 505, 511 (App. Div. 2002) (explaining those factors relate to the seriousness of the offense rather than the background and character of the offender). We likewise have no occasion to address whether the court's conclusion that defendant "demonstrated that [he is] a true menace to society, and that the public will only be safe from [him] if [he is] in jail" in imposing sentence on this third-degree possessory offense is supported by the record.